## WENTZ v. THOMAS.

No. 23652. Opinion Filed Sept. 23, 1932. Concurring and Dissenting Opinions Oct. 8, 1932.

Geo. S. Ramsey, John H. Miley, and Felix Duvall, for plaintiff in error.

J. B. A. Robertson, Haskell, Hirsh & Hirsh, and Leon S. Hirsh, for defendant in error.

HEFNER, J. In the court below Maude O. Thomas, defendant in error, was plaintiff and Lew H. Wentz, plaintiff in error, was defendant; they will hereinafter be referred to as they appeared in the trial court.

Plaintiff commenced this action by filing her petition wherein, among other things, she alleged that she was the duly appointed, qualified, and acting commissioner and member of the State Highway Commission, under and by virtue of the laws of the state of Oklahoma, and that she was in possession of the office and exercising the duties provided by law. She also charged that the defendant had been, and was still, unlawfully claiming the right and title to the office occupied by and in her possession, and prayed that he be restrained and enjoined from obstructing or interfering, other than by proper action at law, with the plaintiff in her possession and exercise of the duties of said office. The court issued a restraining order and assigned the application for temporary injunction for hearing. Defendant filed his answer and cross-petition, and on the same day an agreed statement of

facts was filed, by which both parties waived trial by jury and agreed to submit the application for temporary injunction and **the case for trial on 'the facts and on the pleadings.**

The agreed statement of facts is quite lengthy, but we think it will be sufficient to say that it was agreed that on April 1, 1929, the defendant was regularly appointed Highway Commissioner for the six year term by Governor Holloway; and that Governor Murray, on April 1, 1932, filed an executive order of removal wherein he undertook to remove the defendant from office; and that on the same day he issued a commission to the plaintiff as commissioner to fill the alleged vacancy caused by the removal of defendant.

After the case had been argued upon the pleadings and agreed statement of facts, the trial court entered an order sustaining plaintiff's demurrer to the cross-petition on, the ground that it was not germane to the subject of plaintiff's action; and then adjudged that plaintiff had no prima facie title to the office and was in the unlawful possession thereof; and that the highway act approved April 1, 1929, was the Governor's only authority for appointing a member of the Highway Commission, and that said act was constitutional; and that the provisions thereof conferring exclusive power of removal on the courts were valid and binding; and that the Governor had no power to remove the defendant.

Plaintiff first raises a question of pleading in that she contends that the court was without authority to try the title to the office in this proceeding; that the action is an injunction action to protect her in the possession of the office and that the court will not, in such action, try title to the office; that the demurrer to defendant's counterclaim was therefore properly sustained. To determine whether she is correct in this contention, it is necessary to look to the pleadings filed herein, and especially to the allegations in her petition.

The first and second paragraphs thereof are as follows:

"That the plaintiff is a duly appointed, qualified and acting commissioner and member of the State Highway Commission of the state of Oklahoma, under and by virtue of the laws of the state of Oklahoma. That the plaintiff is in possession of such office and exercising its duties and functions in the manner provided by law.

"That the defendant has been, and now is, unlawfully claiming the right and title to the office occupied and now in the possession of the plaintiff, and has threatened to and will, unless enjoined by this court, interfere with and obstruct the plaintiff in the exercise of the duties and functions of said office, and threatens to and will, unless enjoined by this court, attempt to usurp and occupy the office now occupied by and in the possession of the plaintiff."

In her prayer, she asks for both special and general relief.

In reply to this petition defendant, among other things, filed a general and special denial, and prayed for both special and general relief. When plaintiff alleged that she was a **duly appointed, qualified, and acting commissioner** and a member of the State Highway Commission of the state of Oklahoma, under and by virtue of the **laws of the state of Oklahoma,** and that she was in possession of such office and exercising the duties thereof, and that defendant had been and then was **unlawfully** claiming the right and **title** to the office which was in her possession, and the defendant filed a general denial thereto, the pleadings placed in issue all of the facts alleged by plaintiff.

By these pleadings we think the following issues were raised: First, was the plaintiff **duly appointed** and **entitled** to the **office?** Second, was the defendant **unlawfully claiming title thereto?** These questions were directly raised by general denial and they are questions of law and not questions of equity, for the reason that their correct determination must necessarily depend upon our statutory and constitutional provisions.

Plaintiff contends that the only question she has raised is the naked question of **possession** of the office. If that were true, we would have a different question presented. However, we cannot agree with that contention, for the reason that the allegations in her petition, in our judgment, are contrary thereto. We hold, first, that when she alleged that she was the **duly appointed, qualified, and acting commissioner and member** of the **State Highway Commission** of the state of Oklahoma, under and by virtue of the **laws of the state of Oklahoma,** and that was denied by the defendant, it directly brought in issue the question of whether she had been legally appointed and legally made a member of the Commission, which necessarily carries with it a determination of her title to the office; and second, that when she alleged that the defendant had been and then was making **unlawful claim**

to the **right** and **title** to the **office** occupied by and then in her possession, and he denied that allegation, that directly raised the question of whether his claim to the office was unlawful, and raised the issue of the legality of his claim thereto.

Not only is this true, but an agreed statement of facts was filed which contains the facts and circumstances upon which the plaintiff bases the legality of her appointment to the office, in support of her allegation that she had been duly appointed, and the facts and circumstances surrounding defendant's claim to the title to the office in connection with her allegation that his claim thereto was unlawful. We think the agreed facts contain but few, if any, statements that do not necessarily revolve around these issues. In fact, as we view it, when the issues raised by the allegations of plaintiff's petition and defendant's general denial are determined, there is very little, if anything left in the case.

As we understand it, it is admitted that if title to the office, and not the mere naked possession thereof, is raised in plaintiff's petition, then defendant's cross-petition is germane. Since we hold that issue was raised, it disposes of that question.

When the case came on for trial, it was submitted upon the pleadings and agreed statement of facts—in the language of this court in the case of Bynum v. Strain, 95 Okla. 45, 218 P. 883—to a court endowed with the dual powers of a court of equity and a court of law, where redress for every remediable wrong might be had by a civil action. There it was said:

"Under our Code procedure and system of Code pleading, the court is endowed with the dual powers of a court of equity and a court of law and redress for every remediable wrong may be had by a civil action upon the facts stated in the pleadings called a petition. Sections 174 to 178, inc.; sections 231, 263, 264, and 265, Comp. Stat. 1921.

"Where a pleading is indorsed a 'petition,' as the statute provides, and contains a statement of facts as the statute requires, which show on their face and from their nature that plaintiff has wrongfully sustained a detriment, a wrong for which the law or equity provides redress, then from the nature of the facts stated, the court, vested as it is with the dual powers of a chancellor and a court of law, will determine and grant the proper relief.

"Where the petition of a party in interest states specifically and with sufficient certainty that he is the duly qualified and acting appointee under valid appointment from the Governor to an appointive position in an executive department of state, and that by executive order he has been wrongfully removed from such position, and that such purported order of removal is without authority of law and is void, and that he has unlawfully sustained a detriment by reason of such void and unlawful order of removal, he has stated sufficient facts to give the court jurisdiction to determine whether or not the acts complained of were without authority of law.

"And by such acts it is not improper exercise of jurisdiction for the trial court to determine the validity of the acts complained of, though determination of same may have the effect of determining the legality of title to office."

Undoubtedly, under the facts as disclosed by this record and under the doctrine announced in the Bynum Case, the questions of plaintiff's title to the office and of defendant's right thereto were raised, and both questions should have been determined by the court below. They are now here for determination.

Governor Murray, in his executive order of removal, based his authority to remove the defendant on section 2, article 6, and section 8, article 6, of the state Constitution, and they are as follows:

"The supreme executive power shall be vested in a chief magistrate, who shall be styled 'the Governor of the State of Oklahoma.'

"The Governor shall cause the laws of the state to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the state with other states and with the United States, and he shall be a conservator of the peace throughout the state."

In her brief, plaintiff relies principally upon the provisions of the Constitution with reference to the three departments of government in article 4, which provides:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments; the Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

She contends that the second paragraph of section 1, of the 1929 highway act, vesting exclusive power in case of a removal proceeding in a court of competent jurisdiction to determine whether the officer was guilty as charged, is in conflict with the

Constitution and void because the Governor has the implied power of removal and is not bound by the act. It is urged that the power to appoint officers is necessarily implied from the provisions of the Constitution which define the powers of government and the separate departments—legislative, executive, and judicial—vesting the supreme executive power in the Governor and directing that he shall cause the laws of the state to be faithfully executed.

The proper interpretation of this question must necessarily depend upon the provisions of our own Constitution and not upon that of any other state or of the federal government. It must be remembered that there is no provision in our Constitution which gives the Governor an express power to appoint members of the Highway Commission, or officers generally. The only provisions which expressly confer the power of appointment upon the Governor are:

Article 7, sec. 3—to fill a vacancy in the membership of the Supreme Court;

Article 9, sec. 15—to fill a vacancy in the office of Corporation Commissioner;

Article 6, sec. 13—unless otherwise provided by law, to fill vacancies in office until a successor shall be elected, or appointed and qualified according to law;

Article 14, sec. 1—to appoint a Bank Commissioner for a term of four years by and with the consent of the Senate.

In approaching this question, since plaintiff relies on the case of Myers v. U. S. (U. S.) 71 L. Ed. 160, we must keep in mind the fundamental difference between the federal and the state Constitutions, and the authority of Congress under the one, and of the Legislature under the other. The federal government is one of delegated, enumerated, and limited powers, and when an act of Congress is assailed as void, it is necessary to look to the federal Constitution for a **grant** of **specified power** broad enough to embrace the act; the power of our Legislature to enact a law is subject to no restrictions except those imposed by the state and federal Constitutions. In other words, there must be a grant of authority in the national Constitution, to support an act of Congress; but an act of our Legislature is valid unless prohibited by the state or federal Constitution.

Judge Cooley, in distinguishing these powers, in his work on Constitutional Limitations (8th Ed.) vol. 1, page 354, said:

"There is a broad difference between the Constitution of the United States and the Constitutions of the states as regards the powers which may be exercised under them. The government of the United States is one of enumerated powers; the governments of the states are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the national Constitution to see if the grant of specified powers is broad enough to embrace it; but when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the state we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the Constitution authorizes either expressly or by clear implication; while the state Legislature has jurisdiction of all subjects on which its legislation is not prohibited. 'The law-making power of the state,' it is said in one case, 'recognizes no restraints, and is bound by none, except such as are imposed by the Constitution.' That instrument has been aptly termed a legislative act by the people themselves in their sovereign capacity, and is therefore the paramount law. Its object is not to grant legislative power, but to confine and restrain it. Without the constitutional limitations, the power to make laws would be absolute."

In the Myers Case, supra, the question was, Does the federal Constitution vest power in Congress to create an office to be filled by the President and provide for removal by joint act of the President and the Senate? The court held that there was no provision in the federal Constitution which authorized Congress to pass such an act.

That, however, is not the question here involved. In this case, the question is, Does the state Constitution contain any provision which **prohibits** the Legislature from creating the office of Highway Commissioner and vesting appointive power in the Governor and the jurisdiction to remove, for cause, in the courts? It is admitted that there is no **express** provision which gives the Governor such power. Then, if there is one, it must exist by implication.

Again, there is a fundamental difference between the executive powers of the President of the United States under the federal Constitution and the executive powers of the Governor of this state under our state Constitution. There is no division of the federal executive department; the Presi-

dent has power and control over all of the executive branches of government—each acts as his agent and performs his discretion. It was largely upon this theory that the Myers Case was decided. This is not the case under our state government. The executive authority, under our government, is vested in a Governor and eleven other heads of departments, and, in addition thereto, the Constitution contains a residium clause which authorizes the Legislature to create other officers and place them in the executive department, and make them an independent branch of the executive department, or make them directly responsible to the Governor or to some of the other branches of the executive department.

Section 1, article 6, is as follows:

"The executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner & Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance, and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books, and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law."

From this section it will be seen that the executive department of the state consists of the twelve heads of departments specifically named therein with the further addition, "and other officers provided by law and this Constitution, each of whom * * * shall perform such duties as may be designated in this Constitution or prescribed by law." The words, "other officers provided by law and this Constitution," grant to the Legislature power to create other offices and make them as much a part of the executive branch of the government as is any of the twelve heads of departments named in section 1. The phrase, "and shall perform such duties as may be designated in this Constitution or prescribed by law," grants specifically to the Legislature the power to prescribe the duties of an office created by it.

The framers of the Constitution doubtless deemed it wise to reserve a residium of executive power which the Legislature could enact into law and vest in a new officer or department as it might deem expedient from time to time and as occasion might demand. In this connection, it may be said that there is no such residium of

executive power vested in the national Congress by the Constitution of the United States. When the Legislature created the Highway Department and vested it with administrative and executive powers, it took nothing from the Governor or any other executive officer or department. Before its creation, none of the executive officers mentioned in section 1, supra, had any power to build and construct roads and highways and expend the public moneys for that purpose.

Under the provisions of section 1, article 6, and section 1, article 16, when the Highway Commission was created, the Legislature had power to make it independent and responsible to the people for its acts, or place it under the control of either one of the executive branches of government named in section 1, supra. It did not place it under the control, or make it responsible to, either of the executive branches, but gave it independent discretion.

Not only is this true, but under the heading of public roads, highways, and internal improvements, section 1, article 16, of the Constitution, directed the Legislature, by mandatory provision, to create a department of highways. The section is as follows:

"The Legislature is directed to establish a department of highways, and shall have power to create improvement districts and provide for building and maintaining public roads and may provide for the utilization of convict and punitive labor thereon."

In compliance with this mandatory provision, the Legislature established a department of highways and a portion of the act under consideration is as follows:

"A State Highway Commission is hereby created with offices at the State Capitol, and said offices shall be furnished and provided for by the State Board of Public Affairs. That State Highway Commission created by this act shall consist of three members, not more than two of whom shall be of same political party. Said Commission shall be appointed by the Governor by and with the advice and consent of the Senate; one member shall be appointed for a term of two (2) years; one member * * * for a term of four (4) years; and one member * * * for a term of six (6) years. And upon expiration of the terms of office of said commissioners, respectively, their successors shall be appointed by the Governor by and with the advice and consent of the Senate for a term of six (6) years.

"Any commissioner appointed under the provisions of this act shall hold office for the term for which the appointment is

made. Provided, that any such commissioner may be removed from office only by any court of competent jurisdiction for willful neglect of duty, corruption in office, drunkenness, incompetency, or any offense involving moral turpitude committed while in office."

Under this provision, one member was appointed for a term of two years, one for four years, and the defendant for six years, and upon the expiration of their terms, respectively, their successors were to be appointed by the Governor by and with the advice and consent of the Senate for a term of six years. Evidently, it was the intent of the Legislature, in providing for the terms in the manner in which they were provided, to prevent the appointment of all new commissioners at one time. Doubtless it was thought wise to make such provision in order that the Commission would at all times have two members on it who were familiar with its affairs. Under this system, after the first Commission was appointed, only one member would be appointed in any one year. It was further provided that any commissioner appointed should hold his office for the term for which the appointment was made and that he could be removed from office only by a court of competent jurisdiction for willful neglect of duty, corruption in office, drunkenness, incompetency, or any offense involving moral turpitude committed while in office.

We are not here concerned with the wisdom of this legislation, but only with its interpretation. It will readily be admitted that, under the provisions of the Constitution, the Legislature had complete jurisdiction to establish the Highway Department without express limitations of any kind or character. It was but natural for it to provide for the manner of appointment, the duties of the commissioners, and the manner of their removal. It is admitted that the act is valid, except that portion which provides for the removal of the commissioners. It is our duty to hold that provision valid unless there is a prohibition in the Constitution which precludes its enactment by the Legislature.

In addition to the mandatory provision in the Constitution directing the Legislature to establish a highway department, article 5, among other things, defines the powers and duties of the Legislature. Section 36 thereof provides:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Since it is contended that the provision of the act creating the Highway Commission, which provides for the removal of the commissioners in a court of competent jurisdiction, is unconstitutional and void, the question naturally arises: Is the question as to how an officer is to be removed one of "rightful legislation"? It seems to us that the question of how an officer shall be removed from office is just as much a "rightful" subject of legislation as the question of how he shall be "appointed," or "elected." Undoubtedly the questions, who shall appoint an officer, how long his term shall be, what his salary shall be, and how he shall be removed from office, are "rightful" subjects of legislation. We think article 4 of the Constitution does not, by implication, prohibit the Legislature from providing that the Highway Commissioners may be removed for certain specified causes provided for in the statute by lodging the proceedings in a court of competent jurisdiction, to remove a commissioner from office.

It must be noted that it is not within the power of the court to remove him without a hearing and without his day in court. In fact, before he can be removed it is necessary for a judicial determination of whether he has been guilty of any of the acts set out as causes for his removal. It requires a hearing, introduction of evidence, and a judgment.

It rather seems to us that whether he has been guilty of willful neglect of duty, corruption in office, drunkenness, incompetency, or any offense involving moral turpitude committed while in office, is properly a judicial question. All the court is called upon to do is to determine, on a proper complaint filed by the proper authority, on competent evidence, whether the commissioner had been guilty of any of the specified acts while he was in office. Certainly it cannot be successfully contended that article 4 of the Constitution would prevent a court from entertaining jurisdiction to determine whether the officer was guilty of the acts complained of.

We think it may safely be said that the power of removing an officer for specific cause is, as a rule, a judicial question and the exercise of such power by the courts is not an infringement on the executive department in a case of this character. State v.

Linn, 49 Okla. 526, 153 P. 826; Bowles v. State, 90 Okla. 199, 215 P. 934; State v. Frazier (N. D.) 182 N. W. 545; Atty. Gen. v. Crowley (N. H.) 139 Am. St. Rep. 725; State ex rel. v. Pritchard, 36 N. J. L. 114; People v. Stuart (Mich.) 16 Am. St. Rep. 644; McCram v. Gaul (N. J. L.) 112 Atl. 341; State v. Ballentine (S. C.) 150 S. E. 46; Tompert v. Lithgow, 64 Ky. 176; Speed v. Detroit (Mich.) 39 Am. St. Rep. 555; Black on Const. Law (2d. Ed.) 272; Christy v. Kingfisher, 13 Okla. 585, 76 P. 135; Quick v. Fairview, 144 Okla. 231, 291 P. 95; State v. Chaney, 23 Okla. 788, 102 P. 133.

The state courts have held, almost without exception, that, in the absence of an **express** provision in their respective Constitutions to the contrary, legislative restrictions upon the power of a Governor to remove are valid when applied to one who holds a statutory office. A statement to this effect is found in note 5, in the case of Myers v. U. S. 71 L. Ed. 160. There it is said:

"State courts have uniformly held that, in the absence of express provisions in their Constitution to the contrary, legislative restrictions upon the power of removal by the Governor, or other appointing power, are valid as applied to persons holding statutory offices. Com. ex rel. v. Southerland, 3 Serg. & R. (Pa.) 145-155; * * * Bruce v. Matlock (Ark.) 111 S. W. 990; People v. Jewett, 6 Cal. 291; Gray v. McLendon (Ga.) 67 S. E. 859; Dubuc v. Voss (La. Ann.) 92 Am. Dec. 526; State v. Cowen (Ohio) 117 N. E. 238; Atty. Gen. v. Brown, 1 Wis. 513; * * * Shira v. State (Ind.) 119 N. E. 833; State v. Henderson (Iowa) 124 N. W. 767; Markey v. Schunk (Iowa) 132 N. W. 883; State v. Martin (Kan.) 126 P. 1080; State v. Sheppard (Mo.) 91 S. W. 477; State v. Sanderson (Mo.) 217 S. W. 60; * * * State v. Ganson (Ohio) 50 N. E. 907; * * * State v. Hewitt (S. D.) 52 N. W. 875; State v. Kipp (S. D.) 74 N. W. 440; Skeene v. Paine (Utah) 90 P. 440; State v. Burke (Wash.) 36 P. 281; State v. Grant (Wyo.) 82 P. 2, 81 P. 795."

As an example of what the courts of the various states have held on this question, we take time to call attention to but one of them—Bruce v. Matlock (Ark.) 111 S. W. 990. In that case the Arkansas Supreme Court held that the Governor had no power to remove or revoke an appointment to an office created by the Legislature. It is there said:

"The members of the board having been appointed for a fixed term and as the statute does not confer upon the Governor the power of removal, the power does not exist. The right to remove public officers does not inhere in the chief executive of the state. Throop on Pub. Off., sec. 362; State v. Pritchard, 36 N. J. L. 101. Under our system of government, the executive enjoys no prerogatives in the sense in which that word is usually employed, but he exercises only such powers as are conferred upon him by the Constitution and statutes of the state. These do not authorize him to remove members of the board of public charities. The Governor has nothing to do with the management and control of the charitable institutions of the state further than to appoint the members of the board biennially. The Constitution contains an express command to the Legislature to provide by law for the support of institutions for the education of deaf mutes and for the blind and for the treatment of the insane. Pursuant to this authority, the lawmakers have placed the control and management of these institutions in a board of trustees composed of seven members, to be presided over by the State Treasurer as ex officio member of the board. The Governor is authorized to appoint these members, and there his power in this respect ends. If the Legislature had intended to confer greater or additional powers, it would have been so expressed in the statutes."

Under these authorities and under the provisions of our Constitution and statutes, we think the Legislature had power to prescribe the grounds upon which a commissioner could be removed from office, and to provide that a court of competent jurisdiction could hear and determine whether he was guilty as charged.

It is further urged that, in the absence of any valid provision of the Constitution to the contrary, section 2, C. O. S. 1921 [O. S. 1931, sec. 3522] is in full force and effect and has been since the adoption of the Constitution and that by virtue thereof the Governor has power to remove the defendant. It provides:

"The Governor shall have power to remove any officers appointed by him, in case of incompetency, neglect of duty, or malfeasance in office; and may then fill the same as provided in cases of vacancy."

This is a general statute relating to the Governor's power of removal generally and was in force long before the Highway Commission Act was passed. The act creating the Highway Commission provided therein how and under what conditions the commissioners could be removed. In other words, it was a special act relating to and applying only to the removal of the highway commissioners. This being true, under the well known rule of construction that a general act must yield to a subsequent special act,

it follows that the special act is controlling, and the Governor had no power of removal under the general act.

It is called to our attention that the defendant did not give bond and urged that section 6, chapter 48, S. L. 1923-24 [O. S. 1931, sec. 10084] authorized the Highway Commission to require bond from each member thereof. The provision is as follows:

"The engineer or any other officer or employee of the Commission, who has custody or control of property or funds of the state, shall give a good and sufficient bond, in an amount and with sureties satisfactory to the Commission, conditioned upon the faithful discharge of the duties of their respective offices and accounting for all property and funds coming into their hands by, through, or from such office. Any officer or employee who shall violate the provisions of this section shall be guilty of a misdemeanor, and shall be cause for impeachment."

Acting under this authority, the Highway Commission, on February 12, 1927, passed a resolution requesting bond from each member of the Commission in the amount of $25,000. It is admitted that this provision would not apply to members of the Commission, except for the last sentence which provides that, "any officer or employee who shall violate the provisions of this section shall be guilty of a misdemeanor, and shall be cause for impeachment."

Admitting, without deciding, that it is applicable to a commissioner, there is nothing in the act which requires the giving of a bond before qualifying and taking the oath of office. By the agreed statement of facts, it is admitted that the defendant took and subscribed the required oath of office as a member of the Highway Commission and thereupon entered into possession of the office, exercised the functions, discharged the duties, and received the emoluments thereof, without molestation or hindrance until the issuance and filing of the executive order of removal on April 1, 1932.

It is further agreed that neither the defendant, S. C. Boswell, nor L. C. Hutson, the three members who composed the Highway Commission appointed by Governor Holloway by and with the advice and consent of the Senate, ever made any bond as such officers. The resolution with reference to bond did no more than request that it be given. It did not even require its execution.

Under these facts, the defendant undoubtedly became a de jure officer.

The order sustaining plaintiff's demurrer to the cross-petition is reversed. Judgment is here rendered upon the pleadings and agreed statement of facts, vesting title to the office and right of possession thereto in Lew H. Wentz; and Maude O. Thomas is restrained from interfering with defendant's possession of the office.

The clerk of this court is directed to issue a special mandate to the court below to award the necessary writs whereby the judgment here rendered may be enforced.

LESTER, C. J., and CULLISON, SWINDALL, McNEILL, and KORNEGAY, JJ., concur. CLARK, V. C. J., dissents. RILEY, J., specially concurring. ANDREWS, J., absent.

---

RILEY, J. (concurring specially). The preliminary questions are whether the trial court, possessed of the dual powers of a court of equity and a court of law by the Code, was vested with jurisdiction to settle the whole controversy presented to it under the pleadings, whether it was the duty of the trial court to settle the whole controversy in one decree, and whether defendant in error's motion to dismiss the cause on appeal should have been sustained.

Lew H. Wentz, the defendant below, became a member of the State Highway Commission by appointment of the then Governor, "by and with the advice and consent of the Senate," for a term of six years ending April 1, 1935, under the provisions of an Act of the Legislature approved April 1, 1929 (ch. 68, S. L. 1929, p. 86) [O. S. 1931, secs. 10072-10073] and by his acceptance of the appointment, his having duly qualified for the office and his entrance upon the duties thereof. It is admitted that defendant never resigned or abandoned the office.

On April 1, 1932, Honorable William H. Murray, Governor, signed, issued, and caused to be filed an "Executive Order of Removal," which instrument had for its purpose the removal of Lew H. Wentz from the said office and from all connection whatsoever with said State Highway Department.

By said executive order, the State Auditor was directed to cease the issuance of "warrants of salary or other compensation" to the said Lew H. Wentz, as a member of the Highway Commission, and the said Lew H. Wentz was thereby sought to be removed "from the service of the state, in any form whatsoever."

On the same day the Governor signed and

delivered to the plaintiff below, Maude O. Thomas, an "Order of Appointment," which instrument had for its purpose the appointment of Maude O. Thomas to be Republican member of the State Highway Commission in lieu of Lew H. Wentz, so that she might serve the unexpired term of office of the said Lew H. Wentz.

On the same day Maude O. Thomas took, subscribed, and caused to be filed with the Secretary of State, the statutory oath of office. Likewise she subscribed and caused to be filed a bond conditioned upon her faithful performance of the duties of said office, and without the knowledge of Lew H. Wentz she took physical possession of the office theretofore occupied by the said Wentz. She has ever since remained in possession of the said office.

On April 4, 1932, by order of the Governor, two guards of the State Bureau of Criminal Investigation were assigned to guard the plaintiff, Maude O. Thomas. They were stationed at the door of the office, the title to which is now in dispute in the State Capitol. These guards remained on duty until a restraining order, issued by the court below, was served on the defendant.

On April 4, 1932, there was publisheed and widely circulated an article, prepared the previous day by Lew H. Wentz, wherein was denied the truth of the statement of facts contained in the "Order of Removal" and wherein he challenged the authority of the Governor to either remove him from said office or appoint the said Maude O. Thomas to the said office. Therein also Wentz announced his intention to continue to function as a member of the Highway Commission.

On April 4, 1932, Maude O. Thomas, as plaintiff, commenced this action in the lower court. She alleged her possession of the office; that defendant Wentz was unlawfully claiming right and title to the office and his threatened interference with her possession. She prayed restraint as against Wentz to enjoin him from interference with her in the possession and discharge of the duties of the office. A restraining order was issued April 4, 1932. On April 7th defendant filed an answer and cross-petition. On the same day an agreed statement of facts was filed, a trial by jury was waived, and the cause was submitted "on this agreed statement of facts."

On April 19th plaintiff filed her reply and a demurrer to the cross-petition, also an

answer to the cross-petition, without prejudice to the question raised by demurrer. On April 25th the court (a) sustained the demurrer to the cross-petition on the ground that it was not germane to the subject of plaintiff's action; (b) decreed that plaintiff, Maude O. Thomas, had no prima facie title to the office, and that she was in the unlawful possession thereof; and (c) adjudged that the Highway Act approved April 1, 1929, was constitutional and valid; (1) that its provisions contained "the sole and only source of the Governor's power to appoint a member of the Highway Commission of the state of Oklahoma"; (2) that defendant Wentz "can be removed from said office only by a court of competent jurisdiction"; (3) "that the Governor has no power to remove a member of the Highway Commission"; (4) that the Governor's "Executive Order of Removal" dated April 1, 1932, "is null and void"; (5) that the Governor's "Order of Appointment" dated April 1, 1932, "is null and void'; (6) "that the defendant, Lew H. Wentz, and not the plaintiff, is a member of the Highway Commission of the state of Oklahoma"; (7) "that the plaintiff is not lawfully in possession of the office of member of the Highway Commission; that plaintiff has no prima facie title to the office * * * and is not entitled to any relief in this case."

Plaintiff's petition was dismissed.

Plaintiff filed motion for new trial. It was overruled. The defendant did not file motion for new trial.

On April 25, 1932, both parties, in open court, gave notice of intention to appeal to the Supreme Court.

The defendant appealed from the action of the lower court in sustaining the demurrer to defendant's cross-petition and based it upon his oral notice in open court and his subsequent written notice filed in the court below within ten days from date of judgment.

While plaintiff gave notice of intention to appeal to this court, she has not, within the time allowed by original journal entry of judgment, nor until this date, perfected an appeal.

On June 2nd plaintiff filed a motion to dismiss defendant's appeal based upon the ground that: (1) (a) the appeal is from an order sustaining a demurrer to defendant's counterclaim; (b) that it is not a final judgment; (c) that it is not appealable until final judgment has been entered dismissing the counterclaim; and (2) that de-

fendant did not file a motion for a new trial. This motion to dismiss was denied by the court on the 13th day of July, 1932.

A motion for new trial and judgment overruling it are not a prerequisite to appeal from an order sustaining a demurrer. Barnett v. Tabor, 154 Okla. 20, 6 P. (2d) 787; McGrath v. Rorem, 123 Okla. 163, 252 P. 418; Clapper v. Putnam Co., 70 Okla. 99, 158 P. 297; Gamble v. Emery, 94 Okla. 167, 221 P. 514; Mires v. Hogan, 79 Okla. 233, 192 P. 811; Pace v. Pace, 70 Okla. 42, 172 P. 1,075; O'Neil v. James, 40 Okla. 661, 140 P. 141; Buxton v. Alton-Dawson Merc. Co., 18 Okla. 291, 90 P. 19.

By virtue of section 780, C. O. S. 1921 [O. S. 1931, sec. 528] an appeal may be taken from an order sustaining a demurrer to a counterclaim prior to rendition of final judgment. Okmulgee P. & R. Co. v. Davis, 99 Okla. 4, 225 P. 550; Cont. Gin Co. v. Hull, 25 Okla. 800, 108 P. 369; Wesley v. Diamond, 26 Okla. 170, 109 P. 524; Ashley Silk Co. v. Okla. Fire Ins. Co., 33 Okla. 348, 125 P. 449; Bd. Co. Comm. v. Robertson, 35 Okla. 616, 130 P. 947; Smith v. Kennedy, 46 Okla. 493, 149 P. 197; Knebel v. Rennie, 87 Okla. 136, 209 P. 414; Nation v. Chism, 154 Okla. 50, 6 P. (2d) 766; Crites v. City of Miami, 80 Okla. 50, 193 P. 984.

The statute reads in part:

"The Supreme Court may reverse, vacate or modify judgment of the * * * district court, **for errors appearing on the record,** and in the reversal of such judgment or order, may reverse, vacate or modify any intermediate order involving the merits of the action, or any portion thereof. The Supreme Court may also reverse, vacate or modify any of the following orders of the * * * district court, or a judge thereof. * * *

"Second: An order that * * * sustains or overrules a demurrer.

"Third: An order that involves the merits of an action, or some part thereof."

In Nation v. Chism, supra, this court held:

"It is not necessary that there be a dismissal of the action before an appeal to the Supreme Court may be taken from an order sustaining a demurrer to a petition, where the pleader elects to stand on the petition, and on appeal it is not necessary to allege error in dismissing the action where the action of the trial court in sustaining the demurrer to the petition is alleged to be erroneous."

Such is the rule in Kansas from whence came our Code. Bartholomew v. Guthrie, 71 Kan. 705, 81 P. 491.

We repeat and adhere to the rule long since adopted in this state.

Moreover, if finality of judgment by dismissal be required for such an appeal, which is not the rule, in fact finality of judgment existed, for the trial court sustained demurrer to the cross-petition, held it was not germane, suggested an independent action in the nature of quo warranto, and dismissed plaintiff's petition. The sum and substance of such action was finality of decision. Rosenberg Bros. & Co. v. Curtis Brown Co., 260 U. S. 516, 67 L. Ed. 372; In re Pesaro, 255 U. S. 216, 65 L. Ed. 592.

Hutchison v. Wilson, 136 Okla. 67, 276 P. 198, and Waldock v. State, 146 Okla. 257, 293 P. 1023, and other decisions relied upon by defendant in error are not applicable nor decisive of the question of dismissal. They are upon the doctrine of "piecemeal appeals." Therein this court held that an appeal did not lie from an order sustaining a demurrer to portions of defendant's answer for the reason stated in Tobly v. Dekinder, 85 Okla. 288, 206 P. 201, i. e., for if such orders "were appealable * * * before final judgment there would never be any end to litigation." Such reasons, and therefore the suggested rule, are inapplicable to the question presented, for if the cross-petition is not germane to the plaintiff's petition as found by the trial court, then its aims and objects ceased. It became and was functus officio.

When the demurrer was sustained to defendant's cross-petition he was met with the alternative of (1) excepting to the order sustaining the demurrer and appealing to this court; or (2) amending his cross-petition, if possible, so as to await final judgment, from which an appeal might be had. By act and conduct he elected his remedy by exercising his right of appeal (under the provisions of section 780, C. O. S. 1921) [O. S. 1931, sec. 528] from the order sustaining the demurrer to his cross-petition. 9 R. C. L. 956; 20 C. J. 19.

It is not necessary that the judgment or order contain a recitation of an election— no proclamation of an election by the litigant is required for the simple reason that actions speak louder than words. Okmulgee Prod. & Refg. Co. v. Davis, 99 Okla. 4, 225 P. 550; Bartholomew v. Guthrie (Kan.) 81 P. 491; Exc. Oil Co. v. Crews, Guard., 90 Okla. 245, 216 P. 674.

Nor, under the circumstances, was a motion for new trial required.

The circumstances were that the parties

agreed "To submit the application for temporary injunction and this case for trial on the facts and on the pleadings on this agreed statement of facts." Barnett v. Tabor, 154 Okla. 20, 6 P. (2d) 787; St. L. & S. F. Ry. Co., v. Nelson, 40 Okla. 143, 136 P. 590; Bd. Co. Com'rs v. Porter, 19 Okla. 173, 92 P. 152; C., R. I. & P. Ry. Co. v. Shawnee, 39 Okla. 728, 136 P. 591; Sch. Dist. No. 38 v. Mackey, 44 Okla. 408, 144 P. 1032; Dunlap v. Herring Lbr. Co., 44 Okla. 475, 145 P. 374; Durant v. Nesbit, 59 Okla. 11, 157 P. 353; Henry v. McBride, 102 Okla. 41, 225 P. 906; Garland v. Union Trust Co., 63 Okla. 243, 165 P. 197; McGrath v. Rorem, 123 Okla. 163, 252 P. 418; Patterson v. Carter, 83 Okla. 70, 200 P. 855; Wright v. Lamb, 108 Okla. 16, 232 P. 373.

The agreed statement of facts "is equivalent to a request by both parties for a directed verdict, and constitutes an admission that only questions of law are involved and that there is no disputed or controverted question of fact in the case." 38 Cyc. 1935; Goodwin v. Kraft, 23 Okla. 329, 101 P. 856; Anderson v. Keystone Sup. Co., 93 Okla. 224, 220 P. 605; McGaffey v. Mulky, 115 Okla. 44, 241 P. 480; Con. S. & W. Co. v. Burnham H. M. & Co., 8 Okla. 514, 58 P. 654; F. N. Bk. v. Worley, 100 Okla. 254, 229 P. 234.

The issue of law "could have been brought up on a transcript" (Board Co. Com'rs v. Porter, 19 Okla. 173, 92 P. 152), for "the pleadings, the agreed statement of facts, and the judgment are all parts of the record, and no motion for new trial is necessary for the Supreme Court to review the judgment of the trial court rendered upon such agreed statement." Patterson v. Carter, 83 Okla. 70, 200 P. 855; Durant v. Nesbit, 59 Okla. 11, 157 P. 353; St. L. & S. F. Ry. Co. v. Nelson, 40 Okla. 143, 136 P. 590; Wright v. Lamb, 108 Okla. 16; Baker v. Hammett, 23 Okla. 490, 100 P. 1114.

"When the error is apparent upon the face of the judgment roll * * * then such error will be considered by the appellate court, although not presented to the trial court in the motion for new trial." Kellogg v. School Dist. No. 10, Comanche Co., 13 Okla. 285, 74 P. 110; Int. Harvester Co. v. Cameron, 25 Okla. 256, 105 P. 189.

In such circumstances no exception is required. Caffrey v. Overholser, 8 Okla. 202, 57 P. 206; Gourley v. Williams, 46 Okla. 629, 149 P. 229; Terr. of Okla. v. Caffrey, 8 Okla. 193, 57 P. 204; Std. Ency. of Procedure, vol. 2, p. 273.

The motion to dismiss this cause was on the 15th day of June assigned to the referee of this court for examination and written report. Upon the referee's written recommendation based upon citations and authorities, this court, without dissent, overruled the motion to dismiss. We adhere to the ruling made.

We approach the question as to whether the lower court erred in sustaining demurrer to the cross-petition.

Section 273, C. O. S. 1921 [O. S. 1931, sec. 206] provides:

"The answer shall contain: * * * Second. A statement of any new matter constituting a defense, counterclaim or set-off, or a right to relief concerning the subject of the action * * * and without repetition. Third. * * * Set forth, in his answer, as many grounds of defense, counterclaim, set-off, and for relief, as he may have, whether they be such as have been heretofore denominated legal or equitable or both."

There is no division in form between actions of law and suits in equity in Oklahoma, but an Oklahoma court having jurisdiction to administer relief will administer it dependent upon the facts whether it be at law or in equity or both. Sections 178, 226, C. O. S. 1921 [O. S. 1931, secs. 4, 116, 159]; West v. Madansky, 80 Okla. 164, 194 P. 439.

In commenting on the change in common-law pleading and chancery practice wrought by statute, Sutherland says—Code Pleading, vol. 1, sec. 87:

"The pleader is required only to state the facts which constitute his cause of action * * * the old rule was 'form and not substance,' the Code rule is 'substance and not form'."

"Legal and equitable remedies may now be sought in the same action where they relate to the same subject-matter. The nature of a cause of action is to be determined rather from the object and purpose of the suit than from the character of the evidence which is necessary to sustain it."

The gravamen of the wrong alleged by plaintiff below, the gist of the action at bar, the essence of this lawsuit and the resulting subject of this action, is:

"Right and title to the office occupied by and now in possession of the plaintiff."

By virtue of article 7, sec. 10, Constitution, the district court is vested with power to issue writs of quo warranto, and it possesses original jurisdiction thereby vested in all cases, civil and criminal, except where exclusive jurisdiction by the Constitution or

law is conferred on some other court. Such jurisdiction is not elsewhere otherwise conferred, but section 459, C. O. S. 1921 [O. S. 1931, sec. 766] expressly provides that "such action" (meaning a civil action to try title to office in lieu of quo warranto) may be brought in the Supreme Court or in the district court." Newhouse v. Alexander, 27 Okla. 46, 110 P. 1121; Garrett v. London, 107 Okla. 72, 229 P. 1074.

The lower court adjudged that:

(1) Plaintiff Maude O. Thomas "is not lawfully in possession of the office of member of said Highway Commission," and that she, the plaintiff, "had no prima facie title to the office. * * *"

(2) "That the defendant, Lew H. Wentz, and not the plaintiff is a member of the Highway Commission of the state of Oklahoma."

Thus, by the judgment rendered, actual possession of the office and title to the office were separated. Whenever such a separation occurs, unquestionably there exists in the subject of the action a connected unremedied public wrong.

The conclusion of the lower court was that it would do nothing about it—it dismissed the action, notwithstanding that contained in findings from the pleadings and agreed statement of fact exclusive of the cross-petition, the court adjudged the plaintiff to be a usurper of public office and notwithstanding that by cross-petition the defendant sought restraint against such usurpation of the public office and judgment of title to the office as a de jure member of the Highway Commission, as plaintiff had sought in and by her petition.

It is impossible that two persons can at the same time be de jure officers of the same office. So without yet determining the person to whom title to the office belonged, by reason of its dual power under the Code, the trial court erred in failing to grant complete relief. Both parties urged it; the statute contemplated it. Section 462, O. O. S. 1921 [O. S. 1931, sec. 769]. The public right demanded it.

Until the time of oral argument no good reason appeared for the failure of the lower court to administer complete relief. Upon oral argument it was stated, without dispute, that the reason was the lower court was advised that in event it adjudged possession to Lew Wentz, the Governor of this state would use such force as was necessary to retain Maude O. Thomas' possession of the office until this court had adjudged the matter. The inference was that the lower court was afraid. Such is no reason, but a resort to expediency. This court has long since expressed the view that "A judge who, knowing his duty, does not dare discharge it, is unworthy of high office. The judicial ermine should be stripped from him and he should pass into oblivion. The inference is not justified. We denounce such aspersions cast upon the learned trial court. It may have been that the lower court, in view of such intimidation, resorted to the ancient rule that a court of equity would not perform a useless and futile act. That rule is not applicable, for this court as a superintending agency of the judiciary of the state is ever ready and willing to support the lawful judgments and decrees of inferior courts. Nor was there any occasion for a threat of the use of force, for if the ultimate judgment was unlawful or apparently in error, the aggrieved party had recourse to this court for stay of judgment or supersedeas pending final determination in this court of the judgment.

Force has no place in determination of a judicial issue. The mind is not free in the presence of coercion. Force has a function to perform when resistance is made to judgments rendered. It is the Governor's duty to "cause the laws of the state to be faithfully executed," which duty "applies chiefly to giving effect to the decisions of the courts when resisted by physical force." State ex rel. v. Rowe, 149 Okla. 247, 300 P. 727.

In Bynum v. Strain, 95 Okla. 45, 218 P. 883, defendant Bynum demurred to the petition of Strain. It was overruled. Injunction was granted to restrain Bynum from taking possession of the office of Bank Commissioner of the state. Appeal was perfected and this court swept aside ancient forms of practice to determine the merits of the cause in the spirit of modern Code procedure. Mr. Justice Harrison, speaking for this court, therein said:

"* * * The cause is here upon two propositions, to wit: (1) That this being a suit for injunction, but primarily involving title to office, it is not the proper proceeding, and therefore, the petition fails to state a cause of action. (2) That the Governor having legal power to do the things complained of, plaintiff has no legal grounds for complaint, and for this reason has stated no cause of action."

In disposing of the contention that the court in the injunctive action presented did not have jurisdiction to try title to office this court said:

"As to the first proposition, it is true, as has been held by this court, and generally, so held by courts of other jurisdictions, that neither injunction nor mandamus is the proper remedy for trying title to office, holding the proper procedure to be by proceedings in quo warranto. * * * This is true * * * for the very simple and fundamental reason that title to office is purely a legal question, a title created by statute and determined by statute, hence the chancery powers of a court are not called upon, and will not be exercised, cannot be properly exercised, until as a court of law, it has first determined the legal right. The claim for relief being based upon an undetermined legal right, equity will not respond until the legal right is first determined. Upon these underlying principles of procedure, the courts have held that the legality of title to office cannot be determined by a proceeding in equity; legal rights are not determined by chancery powers."

At that point attention was called to the fact that under our Code the court is endowed with dual powers of a court of equity and a court of law, so that "redress for every remediable wrong may be had by a civil action upon the facts stated in a pleading called a 'petition'."

"So, where a pleading is called a 'petition' as the statute provides, and contains a statement of facts, * * * which shows on their face and from their nature that plaintiff has wrongfully sustained a detriment, a wrong for which either law or equity will grant redress, then * * * the court, vested * * * with the dual powers of a chancellor and court of law will determine and grant the proper relief."

In that case it was then observed that the petition under consideration did specifically state (1) the acts complained of, (2) that they were void, (3) that plaintiff was thereby unlawfully wronged, and it did pray for general relief, that is, for such relief as the facts stated would warrant the court in granting, and it was held that the petition "contained a sufficient statement of facts to give the court jurisdiction to **determine the legality of the Governor's acts and thereby determine the legal right.**" "Hence," it was adjudged, "the court had jurisdiction to first determine the **legal right** and then grant **such equitable relief** as was necessary to protect and enforce the legal right so determined."

In view of the rule stated in Bynum v. Strain, supra, we now examine into the petition filed by plaintiff. It alleges that she is the "duly appointed, qualified and acting commissioner and member of the State Highway Commission of the state of Oklahoma, under and by virtue of the laws of the state of Oklahoma." That she "is in possession of such office and exercising its duties and functions in the manner provided by law." And that "the defendant has been, and now is unlawfully claiming the right and title to the office occupied and now in" her "possession." The prayer is for injunction and for other and further relief.

We examine the answer containing the counterclaim. The answer admits that defendant "has been and is now claiming the right and title to the office." It alleges that he is the de jure commissioner for a term of six years expiring April 1, 1935, and pleads that plaintiff is usurping the office. The prayer is for injunction, judgment of title to the office, and other and further relief.

The agreed statement of facts, which became part of the record or judgment roll, deraigns title, if any, of both parties, to the office.

We possess the firm and fixed conviction that the pleadings, under our Code, presented a justiciable question of law. It presented more than a one-sided controversy, wherein relief could be granted or denied the plaintiff; it presented the whole question as to which, if either of the parties, was entitled to the office. It was and is a two-edged sword, by which the right of one of the parties to the office will be severed. For, under our law, a person entitled to the office and emoluments thereof may maintain an action in the nature of quo warranto. Section 460, C. O. S. 1921 [O. S. 1931, sec. 767]; Bartlett v. State, 13 Kan. 99; Robinson, Co. Comm., v. Chapman, 158 Okla. 244, 13 P. (2d) 173; Newhouse v. Alexander, 27 Okla. 46, 110 P. 1121; Garrett v. London, 107 Okla. 72, 229 P. 1074; Ekern v. McGovern (Wis.) 142 N. W. 595, 46 L. R. A. (N. S.) 822.

The petition not only alleged that plaintiff, in the manner provided by law, was in possession of the office, but it also alleged that defendant unlawfully was claiming the right and title to the office. Such allegations do not concern, nor contemplate, the being of a de facto officer, nor do they encompass the abhorrence of the law toward a vacancy in office, nor do they encroach upon the restriction of public policy preventing any citizen or taxpayer exercising the right to try title to public office, thus to so harass a public officer from beginning to end of his term that he may not attend to the duties of office. But they present naked and undisguised the

whole and sole proposition as to whom shall go the right and title to the office. It is the broad proposition that Mr. Lincoln spoke about at Alton, Ill., in his famous debates with Mr. Douglas, when he said:

"That is the real issue. That is the issue that will continue in this country when these poor tongues of Judge Douglas and myself shall be silent. It is the eternal struggle between these two principles—right and wrong—throughout the world. They are the two principles that have stood face to face from the beginning of time; and will ever continue to struggle." Reply at Alton—October 15, 1858.

This proposition was supported by "a sufficient statement of facts to give the court jurisdiction to determine the legality of the Governor's acts and thereby determine the legal right."

Section 273, C. O. S. 1921 [O. S. 1931, sec. 206] provides that the answer shall contain a counterclaim or a right to relief concerning "the subject of the action," and provides that defendant may set forth in his answer as many grounds of defense, counterclaim, set-off and for relief as he may have, whether they be such as have been heretofore denominated legal or equitable or both.

The counterclaim pleaded fell within the terms of section 274, C. O. S. 1921 [O. S. 1931, sec. 207] as being "the right to relief concerning the subject of the action * * * necessarily or properly involved in the action for a complete determination thereof, or settlement of the question involved therein." Clark v. Duncanson, 79 Okla. 184, 192 P. 806; Pomeroy's Code Remedies (5th Ed.) 644; Bliss on Code Pleadings, sec. 371.

Its contents were within the provisions of the section as being "connected with the subject of the action." Its subject was one **"arising out of the * * * transaction set forth in the petition as the foundation of plaintiff's claim."** Pomeroy's Code Rem. (5th Ed.) sec. 650; Story & Isham Com. Co. v. Story (Cal.) 34 P. 671.

It was germane and sufficient to raise an issue which would be decisive of the controversy. The whole theory of the law with reference to counterclaims is to prevent a multiplicity of suits. Sutherland on Code Pleading Practice and Forms, sec. 267; N. W. Port Huron Co. y. Iverson, 22 S. D. 314, 117 N. W. 372. Its provisions should receive a liberal construction.

The defendant's "right to relief," i. e., possession and/or title to the office, "is necessarily" and/or properly involved for the complete "determination thereof" and/or "settlement of the question involved."

Even though we consider for argument's sake that possession of the office and not title to the office is the subject of the action involved, nevertheless the title to the office is "connected with" the possession of the office and therefore properly involved for a "settlement" of the issue presented.

The issue presented is the "subject of the action." It is not confined to that which plaintiff seeks in her petition, whether it be possession or title to the office, but it extends to "action."

"Action," as here used, contemplates "a proceeding in a court of justice by which a party prosecutes another party for the enforcement or protection of a right (or) the redress or prevention of a wrong. * * * "Section 172, C. O. S. 1921 [O. S. 1931, sec. 9]. "A party" is equally applicable to plaintiff or defendant, and the privilege to "prosecute a right" is available to either plaintiff or defendant in our modern forums of justice.

The right and its infringement is what the action is about. It is the subject of the action. The primary right and the wrong are the elements of the **subject of the action.** Stone v. Case, 34 Okla. 5, 124 P. 960. "While the elements of **the cause of action** are the wrong and the right to redress." Bliss on Code Pleadings (3rd Ed.) sec. 126.

The only justifiable reason at any time existing in law for the trial court's failure to enter a judgment in "settlement of the question involved" was one of form, and that the modern code and the practice adopted has abolished. Kimball v. Connor, 3 Kan. 425; Calaghan v. Irvin (Tex. Civ. App) 90 S. W. 335; Walker v. Hopping (Tex. Civ. App.) 226 S. W. 146; Hastings v. Montgomery, 142 Okla. 48, 285 P. 89; McGhee v. Milburn, 85 Okla. 17, 204 P. 279; McArthur v. Moffett, 143 Wis. 564, 33 L. R. A. (N. S.) 264.

The lower court had jurisdiction to determine the whole controversy (section 453, C. O. S. 1921 [O. S. 1931, sec. 765]. In fact, by the text of its judgment it will be observed that it did decide the whole controversy. Assuming, without deciding at this point, the correctness of the lower court's view of the law, it should not have withheld complete relief, for section 462, C. O. S. 1921 [O. S. 1931, sec. 769] not only provides for a judgment in favor of the person entitled to the office, but in addition makes it the duty of the court to order the one not entitled to "deliver over all books and papers

in his custody or within his power belonging to the office." Baugh v. Barrett, 69 Iowa, 495, 29 N. W. 425; West v. Madansky, 80 Okla. 161, 194 P. 439.

Legal and equitable actions are included within the term "all cases, civil," as used in article 7, sec. 10, Constitution. By virtue of sections 178 and 266, C. O. S. 1921 [O. S. 1931, secs. 4, 116, 199] a district court, having acquired jurisdiction of the persons and possessing jurisdiction of the subject-matter of an action in equity, will retain jurisdiction to administer complete relief, whether nature of that relief be legal, equitable, or both.

"Ordinarily, it is the duty of the court to render such judgment as on the whole record the law requires without regard to any request or want of request therefor." Fox v. Fox, 117 Okla. 46, 245 P. 641; 21 R. C. L. 489; Fraley v. Wilkinson, 79 Okla. 21, 191 P. 156; Pittsmount Copper Co. v. O'Rourke (Mont.) 141 P. 849; Averill v. Vermont Valley R. R. (Vt.) 92 Atl. 220.

"Even under the procedure in courts of equity in states where distinctions between courts of law and courts of equity are maintained, where a court of equity properly acquires jurisdiction over the subject-matter and the parties, it retains jurisdiction until complete relief is granted according to the facts in the case." West v. Madansky, supra; Pomeroy's Eq. Juris. (3rd Ed.) vol. 1, p. 342; Murray v. Speed, 54 Okla. 31, 153 P. 181.

The Wisconsin court, in Ekern v. McGovern, supra, where the cause, as here, was commenced for injunctive relief, presented the inquiry to itself:

"Should the court rest in a case of this sort, having reached a point calling for judgment indicating the primary right—right to immunity from being forcibly dispossessed by illegal methods—leaving the more important question, the right to the office, undetermined? * * *

"Must parties in such a case, though in the court having jurisdiction to settle the whole controversy, depart with but partial relief and none as to the ultimate matter, and come back, not really in another form of action, because we really have but one, but asking another form of relief * * * and from a practical standpoint, including it?

"Under our liberal Code of Procedure, rightly understood and administered. is it true that such devotion to mere form is necessary, commendable or really right?"

The answer was:

"* * * There is no judicial difficulty in the way of the trial court finally disposing of the whole controversy between the parties.

"The right to protection against violent disturbance, pending settlement of the title, was the primary right. The right to the office was incidental thereto, and had to be judicially settled sometime. * * *

"The court having jurisdiction of the parties and of the primary subject-matter was competent to settle the whole controversy— the main issue and all the incidental controversies connected therewith—in a single decree."

Therein it was held that the legal right and issue as to title to the office was germane to the primary equitable issue of protection against violent disturbance of or interference with the possession of the office pending settlement of title, and that where it appears justice will best be subserved thereby, the court should settle the whole controversy in a single decree.

We follow that rule.

Under the state of the record the trial court erred in its failure to grant complete relief in one decree to the party thereto entitled. Stamps v. Tittle (Tex. Civ. App.) 167 S. W. 776; Mathews v. Sniggs, 75 Okla. 108, 182 P. 703; Callaghan v. Irvin (Tex. Civ. App.) 90 S. W. 335; Walker v. Hopping (Tex. Civ. App.) 226 S. W. 146; Blain v. Chippewa Circuit Judge (Mich.) 108 N. W. 440; West v. Madansky, supra; McKay v. Kelly, 130 Okla. 62, 264 P. 814.

We now proceed to determine the particular party, if any, entitled to complete relief, and in so doing we are confronted with the paramount question whether the Governor is possessed of power to remove from office a member of the State Highway Commission.

"* * * If there be a law and a properly presented controversy as to its meaning, it then becomes the duty and a proper province of the judiciary to interpret such law and declare its meaning. The executive will then be guarded by the court's interpretation of the law and will execute the court's mandates." Bynum v. Strain, supra.

What is the law applicable? It is House Bill 284, ch. 68, S. L. 1929, p. 86 [O. S. 1931, secs. 10072-10073). It creates a State Highway Commission consisting of three members and provides for their appointment by the Governor, by and with the consent of the Senate. It fixes their terms of office and the terms of office of their successors, and it provides, by the second paragraph of section 1 that:

"Any commissioner appointed under the provisions of this act **shall hold office for the term for which the appointment is made.** Provided, that any such commissioner may

be removed from office **only** by any court of competent jurisdiction for willful neglect of duty, corruption in office, drunkenness, incompetency, or any offense involving moral turpitude committed while in office."

What the Legislature has said in the foregoing paragraph of section 1 is unambiguous and clear. The intent is obvious from its plain language.

The highway commissioner so appointed "shall hold office for the term for which the appointment is made."

"There can be no justifiable mistaking of the above language." Bynum v. Strain, supra.

Now the appointment of Wentz is agreed to be for a term of six years, ending April 1, 1935. So then, by the words of the statute, his right to the office is continuing to the day, month, and year first above stated, subject to (1) his continued being, and (2) remaining, a resident of the state, (3) his resignation, or (4) his conviction of any infamous crime or any offense involving a violation of his official oath. Section 132, C. O. S. 1921 [O. S. 1931, sec. 3408]. The proviso, by the law, established the exception by which his right and title to the office may not exist. It is that "any such commissioner may be removed from office **only** by any court of competent jurisdiction for" specified and enumerated causes.

We now turn to the agreed fact:

"Lew H. Wentz has not resigned or abandoned said office, * * * and he has not been removed or suspended from office of member of such Commission by 'any court of competent jurisdiction' and no proceedings therefor have been instituted in any court"

The agreed facts contemplate his being. The executive order of removal (Ex. "A") contemplates his being "a member of the State Highway Commission" prior to the purported removal, which is tantamount to an admission of his having qualified at the time of removal. The law says but one thing, it implies but one thing, viz., "May be removed from office only by any court of competent jurisdiction," not by the Governor. It specifies the grounds for removal and selects the department of the government which is to ascertain the establishment of the grounds for removal or any of them.

Can it be said in good faith that the language means that the "Governor shall exercise the power of removal or determine the cause for removal"? Or is the assumption of the exercise of such power anything other than an assumption of power, not warranted by law?

The language of the law makes it both clear and emphatic as to the duration of term of such an officer, the department of government vested with the power to remove from office, and the grounds to be ascertained and determined by that agency so vested with such power of removal.

This law cited and quoted, if constitutional and valid, is decisive of the paramount question, as to whether the Governor is possessed of power to remove from office a member of the Highway Commission, and the resultant question as to whether Lew H. Wentz is entitled to a writ bestowing the office upon him, for if there was no vacancy, it is elementary that the appointment of Maude O. Thomas to the office is void.

In Bynum v. Strain, supra, it was held that: "It is unnecessary to decide this case upon the doctrine that the power to remove is an incident to the power to appoint, although," it was said, "the federal courts have uniformly adhered to such doctrine, and in our opinion, the far better reasoned cases from the state courts have concurred in the same doctrine," "but," it was there held, "it is unnecessary to resort to that doctrine in a determination of this case; the statute has determined it." So the statute has determined the issue here.

It is unnecessary to consider in this case or in this state, as applied to the Governor, incidental or implied power of removal, for by general statute, section 2, C. O. S. 1921 [O. S. 1931, sec. 3522] "in case of incompetency, neglect of duty or malfeasance in office," "the Governor shall have power to remove any officers appointed by him."

Now, in the absence of inapplicability of such a statute, resort and consideration might be had to incidental or implied powers such as was presented in City of Ardmore v. Sayre, 54 Okla. 779, 154 P. 356, wherein the question was whether the power of the mayor to appoint carried with it the power of removal, and wherein it was held that: "Such seems to be the general rule adopted in this state, unless prohibited by statute." Cameron v. Parker, 2 Okla. 277, 38 P. 14. However, it is the law that where a particular statute is applicable, a general one has no function to perform. The Highway Act, supra, applies to the office here involved. Section 2, C. O. S. 1921, is not applicable. The Highway Act functions to eliminate from consideration incidental or implied powers of removal by the appointing authority, for it not only expressly vests

the removal power in the courts, but in addition it prescribes that such vesture of authority is the "only" power of removal and that it is to exercise only upon the establishment of specified grounds or causes or some one of them. If the Highway Act is unconstitutional, then the general statute (section 2, C. O. S. 1921) is applicable, so that implied power is in no event material.

While it may be and it is the true rule that implied powers sometimes are carried along with vested powers, in order that a department or an office may function, yet it is impossible that with a specific divestiture of power from a department and with a specific vesture of that power in another department, there would remain in the first department an implied power as an incident to a power abrogated.

Is this act of divestiture and vesture of powers of removal constitutional?

As applied to the state as differentiated from the federal government, in order to determine the constitutionality of law, it is not necessary that we look to the Constitution to ascertain authority of the Legislature for the enactment of a statute, but it is necessary only that we look to the Constitution to ascertain whether there is any prohibitive limitation against its enactment, for "in the absence of prohibitive limitation, the Legislature would have" such power. Bynum v. Strain, supra.

The federal government is one of delegated, enumerated, and limited powers, so that when an act of Congress is assailed, as being void, the judges must look to the federal Constitution to determine whether the specific grant of power is sufficient to embrace it, whereas, the power of the Legislature to enact a law is subject to no restriction, except those imposed by state or federal Constitution. Briefly, the federal Constitution must authorize an act of Congress, but a legislative act is valid unless prohibited. U. S. v. Harris, 106 U. S. 629, 27 L. Ed. 290; Grafton v. U. S., 206 U. S. 233, 51 L. Ed. 1084.

Cooley says (Const. Lim. [8th Ed.] vol. 1, p. 354):

"The government of the United States is one of enumerated powers; the governments of the states are possessed of all the general powers of legislation. * * * Congress can pass no laws but such as the Constitution authorizes either expressly or by clear implication, while the state Legislature has jurisdiction of all subjects on which its legislation is not prohibited."

The object of the state Constitution, says Cooley, "is not to grant legislative power, but to confine and restrain it; without the constitutional limitations, the power to make laws would be absolute."

In the City of Denison v. Municipal Gas Co. (Tex. Civ. App.) 257 S. W. 616 (see, also, 3 S. W. [2nd] 794), the Texas court said:

"* * * The state Legislature is virtually omnipotent in the matters of legislation except in so far as the inhibitions of the Constitution plainly or by clear and necessary implication limit its power."

"* * * In all cases of doubt and until it is made clearly to appear that they contravene some constitutional provision," says the Indiana court, Overshiner v. State, 156 Ind. 187, 83 Am. St. Rep. 187, the General Assembly's acts "are to be upheld by the courts," thus the burden is upon the assailant of the constitutionality of such a law to point out the particular provision of the Constitution that has been violated.

Our own court, in State ex rel. v. Hooker, 22 Okla. 719, 98 P. 964, express the view that:

"In creating the legislative department and in conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in and may be exercised by the sovereign power of any country subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department of a state is not made a special agency for the exercise of specifically defined legislative powers, but is intrusted with the general authority to make laws at discretion."

This is necessarily the rule in our state, for the Constitution by section 36, art. 5, by specific grant, provides:

"The authority of the Legislature shall extend to all rightful subjects of legislation. Any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Thus the basic law by which the act of Congress was measured in the Myers Case (272 U. S. 52, 71 L. Ed. 160) has no application to the case at bar, for there the query was, Does the federal Constitution authorize Congress to create an office to be filled by the appointment of the President by and with consent, etc., and restrict the removal to a joint action of the President

and the Senate? The Supreme Court of the United States by a majority answered the query, "No."

The question at bar is, "Does the state Constitution prohibit the Legislature from creating an appointive office and vesting the power of removal exclusively in the courts?" Miller v. Childers, 107 Okla. 59, 238 P. 204.

The Myers Case involved the construction of the federal Constitution and the relative powers of Congress and the President. We are here concerned with the state Constitution and the relative powers of the Legislature and the Governor.

The decision of the Supreme Court of the United States in the Myers Case is not binding upon this court.

"Its decisions upon questions arising out of the federal Constitution and federal statutes are binding on us; but so, on the other hand, our decisions upon questions arising out of our state Constitution and our state statutes are binding upon it. At the same time upon that wide domain which is presented by general jurisprudence, the federal Supreme Court and the state Supreme Court hold an equal and divided jurisdiction, our opinions are not binding upon it, nor its opinions upon us." Franklin v. Kelly, 2 Neb. 85; Black's Law of Judicial Precedents, 366.

The Myers Case held void a section of an act of Congress providing that "postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate and shall hold their offices for four years unless sooner removed or suspended according to law. * * *" The court's opinion and decision was that Congress did not have authority to take away from the President and vest in the President and the Senate jointly the power of removal.

This was the construction placed upon sections 1 and 2 of art. 2 of the federal Constitution by Congress under the expressed views of Mr. Madison in the famous debates of the first session of Congress in 1789. The federal rule is that the federal Constitution vests the power of removal in the President as an incident to the President's constitutional power of appointment. This federal rule of construction went unchallenged until the tenure of office act was adopted as a part of the reconstruction program in 1867.

There was adherence to the rule in Parsons v. U. S., 167 U. S. 324, 42 L. Ed. 185 (May, 1897). It was applied as early as 1839, in Re Hennen, 13 Pet. 230, 10 L. Ed. 138.

But, as pointed out heretofore, there is a fundamental difference between the federal and state governments. No case decided by a state Supreme Court has been called to our attention and we know of none where it is held that the Legislature in creating an office cannot vest the power of removal in the courts except where there was a constitutional provision expressly conferring the power of removal upon the Governor. In other words, state courts do not apply the federal rule to state Constitutions. Mr. Justice Brandeis so states this distinction in his dissenting opinion in the Myers Case.

Willoughby on the Constitution, vol. 2, p. 1187, published 16 years before the Myers decision, says:

"* * * It seems to be established that the right of removal from office exists in the President unless taken away in plain and unambiguous language, **and that it is by no means certain that it may be taken away even when such language is used.** In the states, however, this doctrine does not apply to the Governor. Here it has been generally held that he has no **inherent** power of removal. * * *"

By virtue of section 2 of the Code, carried forward from the Territorial Laws of 1890, and re-enacted in 1913, by the adoption of the R. L. of Oklahoma, specific power is vested in the Governor to remove any officer appointed by him, for causes enumerated. This is a general statute not applicable to the case at bar except that it shows a legislative construction that no inherent or incidental power of removal vests in the Governor. If it did, what was the necessity of a statute granting the right? The federal rule announced in the Myers decision construing the federal Constitution is not persuasive because of the fundamental difference between the powers of the Governor and the President of the United States.

Section 1, art. 2, of the federal Constitution, provides simply:

"The executive power shall be vested in a President of the United States."

Section 2, art. 2, Fed. Const., provides:

"* * * And he shall nominate, and by and with the advice and consent of the Senate, shall appoint ambassadors, other public ministers and consuls, Judges of the Supreme Court and all other officers of the United States whose appointment are not

herein otherwise provided for, and which shall be established by law; but the Congress may by law vest the appointment of such inferior officers as they think proper in the President alone, in the courts of law, or in the heads of departments. The President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session."

Thus it is obvious, as was settled in the Myers decision, that all executive power of the federal government is vested in the President, and that except as to inferior offices the appointment of officers for the federal government is a function to be performed by the President. The Hamiltonian idea of centralization of power there prevailed. It was quoted:

"In that which grants the executive power, the expressions are: 'The executive power shall be vested in a President of the United States.' The enumeration ought therefore to be considered as intended merely to specify the principal articles implied in the definition of executive power; leaving the rest to flow from the general grant of that power. * * *"

Thus the decision, as applied to the federal Constitution, was: The moment an office and its powers and duties are created, the power of appointment and removal, as limited by the Constitution, vests in the executive."

There is no general provision contained in the Constitution of Oklahoma such as section 2 of art. 2, federal Constitution, vesting the appointing power in the Governor, but to the contrary, section 13, art. 6, Constitution of Oklahoma, provides:

"The Governor shall commission all officers **not otherwise commissioned by law.**" "When any office shall become vacant, he shall, **unless otherwise provided by law,** appoint a person to fill such vacancy, who shall continue in office until," etc.

It was the view in the Myers Case "that Congress is only given power to provide for appointments and removals of inferior officers after it has vested," i.e., after the creation of the inferior office with a provision for appointment and removal of such officer "in other authority than the President." Here it may be observed that the section under consideration provides merely that as Congress "think proper" they may vest the appointment of such inferior officers "in the President alone, in the courts of law, or in the heads of departments." There was no constitutional

provision nor implied provision for vestment of removal power in the Senate as was sought to be done, except that it may be considered the head of its department in so far as its clerks are concerned. No doubt with the rule of construction in mind as to determination of the constitutionality of an act of Congress the Supreme Court of the United States held, "the provisions of the second section of art. II, which blend action by the legislative branch, or by part of it, in the work of the executive, are limitations to be strictly construed and not to be extended by implication." By reason of section 13, art. 6, and section 36, of art. 5, Constitution of Oklahoma, the Legislature of Oklahoma may provide as it thinks proper for the selection and removal of an incumbent of an office created by it, subject only to limitations contained in the Constitution.

It is not contended by defendant in error that "the act of appointmeent or the act of removal is exclusively legislative, executive, or judicial" either under our Constitution or "in nature." P. 83, Brief.

The contention is that "the criterion is not the act itself, but the department of government to which the office is properly assignable." The asserted basis of the contention is section 1, art. 4, Constitution, which provides:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments, the legislative, executive and judicial; and except as provided in this Consttitution, the legislative, executive and judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

It is urged that by reason of the foregoing constitutional provision the Legislature, despite the broad grant of power contained in section 36, art. 5, Constitution, supra, was not possessed of authority to divest the executive department of removal power as applied to an appointed executive officer, for the reason that such an act did not constitute a "rightful subject of legislation." No decision so holding from any state is cited and we know of none. Sibert v. Garrett, 197 Ky. 17, 246 S. W. 445, is relied upon; the words therein used are, the "appointing agency should, perhaps, be selected from the department to which the duties of the office necessarily appertain." Nothing therein relates to removal. The decision therein concerned whether the Legislature itself could appoint an executive of-

ficer or whether, under the mandate of the Constitution, it should simply provide for the appointment. This contention has never before been urged during the quarter century of this state's existence, while to the contrary, all the Governors of this state, including the learned counsel who urged the proposition, have executed the laws under the contrary construction by executive appointments of district and superior judges to fill vacancies within the judiciary. The various messages of the various Governors, upon the condition of state, are eloquently silent upon any suggestion to the Legislature for a change by statute, for the policy now urged, so as to provide for inferior judicial appointments by the judicial department.

To the contrary, in Leedy v. Brown, 27 Okla. 489, 113 P. 177, this court held that by virtue of statute the district court was vested with power to suspend from office an executive officer and that such a grant of power by statute was "not in conflict with section 1, art. 4, of the Constitution." The view there expressed was:

"The whole matter of removal or suspension from office, the causes for which, and the mode in which it may be effected, not being expressed in the Constitution, is a proper subject of legislation. It is a part of the sovereignty of the state—part of the lawmaking power, and is not either expressly or impliedly withheld from the General Assembly."

Doubtless the creation of a Highway Department is a rightful subject of legislation. Section 1, art. 16, Const. Doubtless the creation of offices within that department is a rightful subject of legislation. Doubtless the vesting of the appointive power in the Governor by and with the advice and consent of the Senate is a rightful and well-considered subject of legislation. No doubt the Legislature had power under the general grant to provide for removal of the officer to be appointed. Whether to remain silent as to the removal power and thus permit section 2, C. O. S. 1921 [O. S. 1931, sec. 3522] to govern, or whether to express it and vest it in the judicial branch of the government, was a matter of legislative discretion.

The discretion by the Legislature exercised was a rightful subject of legislation under the Constitution. Without doubt a district court, being a court of general jurisdiction, would have power to hear and determine causes for removal of such an officer.

Moreover, section 1 of art. 4, Constitution, supra, does not wholly inhibit the exercise of the powers properly belonging to one department by either of the others, for the provision is, "except as provided in this Constitution." There is an exception otherwise contemplated in the Constitution, for, by section 36, art. 5, it is stated:

"Any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Now, by section 60 of the same article, the duty is cast upon the Legislature to provide a system of checks and balances between officers of a department. Certainly there is no inhibition against the power of the Legislature to continue a system of checks and balances in resistence of instability of tenure of office based upon whim or caprice of the appointing power by placing the removal power in another and proper department.

Furthermore, such an act may properly be considered a part of a "system of checks and balances between officers of the executive department, and all commissioners * * * and boards of control of state institutions."

Such is the rightful subject of legislation.

The Myers decision held:

"* * * Article 2 grants to the President the executive power of government, i.e., the general administrative control of those executing the laws, including the power of appointment and removal of executive officers—a conclusion confirmed by his obligation to take care that the laws be faithfully executed."

In Marberry v. Madison, 1 Cranch, 137, 2 L. Ed. 60, the Chief Justice of the United States, Marshall, speaking for the court, said in reference to the powers of the President.

"To aid him in the performance of these duties he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." State ex rel. Haskell v. Huston, 21 Okla. 802, 97 P. 982.

The Constitution of Oklahoma makes no such investiture of executive power in the Governor.

Section 1, art. 6, Const. of Oklahoma, provides:

"The executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance, and **other officers provided by law,** and this Constitution, each of whom * * * **shall perform such duties as may be designated in this Constitution or prescribed by law.**"

"And while each must operate within the general comprehensive sphere of the executive department, with the Governor as Chief Executive, yet each is endowed with a limited independence and held directly responsible to the electorate for the discharge of its specified duties. But the Banking Department is not one of this class; it is a department within the distinctive sphere specially prescribed to the Governor. such as the Board of Affairs." Bynum v. Strain, supra.

"The executive authority, by section 1, art. 6, Constitution, was vested and parceled out to a Governor, Lieutenant Governor and certain other constitutional executive officers therein named." In re Initiative Pets. No. 112 et al., 153 Okla. 233, 6 P. (2d) 703.

Thus it is plain that the Constitution of Oklahoma vested the executive authority, not as by the federal Constitution, in one official, but in twelve separately named officials and with provision for future legislative vestment of executive authority "in other officers provided by law and this Constitution," "each of whom * * * shall perform such duties as may be designated in this Constitution or prescribed by law," thus evidencing the specific instruction. except as otherwise provided for, that these officers were not to perform duties under the direction of the Chief Executive, but to do their duty as outlined in the Constitution and laws. Thus there was adopted the admonition of Wellington as expressed to the soliders, "Do your duty as an Englishman."

The Governor has no constitutional power to appoint (except to fill vacancies) or remove any of the other executive officers named in the Constitution (except Bank Commissioner, sec. 1, art. 14, Const.). They are elective by and responsible to the sovereignty for the faithful discharge of their duties. The Governor is not responsible to the sovereignty for the faithful performance of the duty of any of them. Except that upon their commission of impeachable offenses he should recommend their impeachment to the Legislature. They can be removed from office only in the manner provided by the people in their Constitution.

Thus it is obvious that the Hamiltonian idea of a centralized form of government by a concentration of all executive authority in one office, was not the public policy adopted by the people and expressed in Constitution of Oklahoma. To the contrary, the Constitution of this state embraced the political idea of a plural executive department. One consisting of many executive officers who would obey the law rather than policy of a man who might happen to occupy the position of Governor.

There is a fundamental difference between the federal and state governments as to where an undefined power rests. If a power exists in the federal government which has not been expressly or by necessary implication vested in the courts or in Congress, then it is vested in the executive department, but as applied to the states it is "a well-settled political proposition that, whenever the legislative powers of a government are undefined, it includes the judicial and executive attributes." (I Peters' Cond. R. 213.)

"The executive and the judiciary, therefore, can exercise no powers but such as are granted, while the Legislature can exercise all powers not forbidden." Field v. People, 3 Ill. 111.

The Legislature is the General Assembly, with its historic power to give expression to the people's will upon all rightful subjects of legislation. It is possessed of all powers of government not denied it, reserved to the people, or delegated to the federal government or the executive and judicial departments of state government. The executive and judicial officers, in the strictest sense, are mere agents or servants of the people, and vested with mere delegated authority and powers.

The Illinois court in Field v. People, 3 Ill. 79, said:

"In deciding this question (power of the Governor) recurrence must be had to the Constitution. That furnished the only rule by which this court can be governed. That is the charter of the Governor's authority. All the powers delegated to him by, or in accordance with that instrument, he is entitled to exercise, and no others. The Constitution is a limitation upon the powers of the legislative department of the government; but it is to be regarded as a **grant** of powers to the other departments. Neither the executive nor the judiciary, therefore, can exercise any authority or power, except such as is clearly granted by the Con-

stitution. * * * Upon the principle of our government, that the sovereign power of the state resides in the people, and that only such powers as they have delegated to their functionaries can be exercised, where a claim of power is advanced by the executive, the question is, not whether the power in question has been granted to the people, but whether it has been granted to the executive; and, if the grant cannot be shown, he has no title to the exercise of the power."

Thus it is seen that "the supreme executive power" vested in the Governor by section 2, art. 6, Constitution, is, in fact, just that executive authority not otherwise vested by the preceding section of the Constitution and that it is only such specific executive power as is by the Constitution granted to the chief executive or required for the performance of such duties "as may be designated in this Constitution or prescribed by law." This "supreme executive power" does not extend to the execution of all duties pertaining to the executive department of government.

The Governor, as an agent of the people with only delegated, restricted, and limited executive powers, possesses no inherent right "to appoint to office (Fox v. McDonald, 101 Ala. 51, 13 So. 416, 46 Am. St. R. 98), nor to remove from office." Nolan v. State, 118 Ala. 154, 24 So. 251 (cited and quoted under section 2, art. 6, of Wms. Const. & Enabling Act of Oklahoma), but under the words of the Constitution of Oklahoma, the creation of offices, the fixing of tenure, emoluments, duties, the manner of filling them, whether by election or appointment, the selection of the appointing or removal power and the causes for removal are "all rightful subjects of legislation." State ex rel. v. Hooker, 22 Okla. 719, 98 P. 964.

."* * * Unless limited by constitutional restriction, the General Assembly may exercise all governmental power. But under our system of government it is limited by the establishment of the two other departments, and prohibited from the exercise of any power confided to them." People v. Morgan, 90 Ill. 558.

In Miller v. Childers, 107 Okla. 59, 238 P. 204, this court said:

"While Congress of the United States may do only that which the federal Constitution has granted unto it the power to do, the Legislature may, in a general sense and as to rightful subjects of legislation, do all except that which by the Constitution it is prohibited from doing." Hovey v. State, 119 Ind. 395, 21 N. E. 21; Dunbar v. Cronin, 18 Ariz. 583, 164 P. 447.

The basic soundness of the different rule applicable to Congress is appreciated when it is observed that by the federal Constitution, section 1, art. 1, it is merely provided that: "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives," and by section 8, of art. 1, the legislative powers granted are specifically enumerated, whereas by the Constitution of Oklahoma (section 46 to 53, of art. 5) there is a specific enumeration of limitations upon the Legislature. There is no such provision in the state Constitution as contained in section 1, art. 1, federal Constitution, supra, nor is there such a provision in the federal Constitution as contained in section 36, art. 5, Constitution of Oklahoma, for the authority of Congress does not extend to all rightful subjects of legislation except where inhibited.

By reason of the nature of the federal structure of government, if there is a doubt as to whether a given power has been lodged in the executive or legislative department, the doubt is by the courts resolved in favor of the executive department, for Congress has no power except those granted to it. To the contrary, if there be a doubt, as applied to the state, whether a power has been lodged in the executive, the doubt is resolved in the negative, because the executive department is one possessed of delegated, enumerated, and limited powers. Consequently, in determining the validity of an act of the Legislature of Oklahoma delegating exclusive power of removal to the courts, in order to adjudge the act unconstitutional and so void, we must have a provision of the Constitution forbidding the Legislature to so vest the removal power. There is no such provision.

There is a fundamental difference between the office of President of the United States and Governor of Oklahoma. The executive officers of the federal government under the President constitute his alter ago, they are subject to his orders and are expected to carry out his political policies, whereas the executive officers named in the Constitution of Oklahoma, and the members of the Highway Commission, are not subject to the Governor's orders, nor directions as to duties except where that power is expressly granted to the Governor by the Constitution or statute (nor are they in theory officially concerned with the Governor's political policies.)

"It is not within the power of the Chief Executive to prevent the State Examiner and Inspector from discharging any duty imposed upon him by virtue of the Constitution, or the statutory law as in force in this state." State ex rel. Taylor v. Cockrell, 27 Okla. 630, 112 P. 1000.

But it was held the duties of that officer "are to be discharged by him independent of the Chief Executive of this state."

"The state executive officers below the Governor, with few exceptions, are as independent of his control in the performance of their duties as are the officers of the counties or of the townships." State ex rel. Atty. Gen. v. Huston, 27 Okla. 606, 113 P. 190.

As applied to the executive officers under the President, "the discretion to be exercised is that of the President" and the President may remove such an officer because he does not consider his decision wise. Myers v. U. S., supra.

Therefore "the President needs as an indispensable aid to meet it (responsibility under the Constitution for the effective enforcement of the law) the disciplinary influence upon those who act under him of a reserve power of removal."

"In such cases they are exercising not their own but his discretion * * * Each head of a department is and must be the President's alter ego in the matters of that department where the President is required by law to exercise authority. * * * His cabinet officers must do his will * * * he must have the power to remove without delay * * * all appointed by him." Myers Case, supra.

The Governor has no such powers over elective officers of the state of Oklahoma, nor over officers appointed by him who are not directly accountable to him for the discharge of duty.

The President possesses a power in the executive department approaching that of a king.

See modification of sovereign's power as to appointment of judiciary (13 William III C2) cited in State ex rel. v. Rowe, 149 Okla. 240, 300 P. 727. Thereunder and thereafter the judge held over after the reign of the King. It is recalled that, without express provision of law, certain executive officers, particularly cabinet members, hold over beyond the administration of the President appointing them and without reappointment and reconfirmation by the Senate. (Ex-Secy. of Treas.—Mellon).

"At common law, the theory was that the King was the head and fountain of all office. * * * In legal contemplation, the incumbent held directly from and under the Crown, one of the implied conditions of such holding being that the duties of the office should be properly discharged. * * * It consistently resulted that a ruler, clothed with such powers as these, should, subject to the limitations already defined, be also invested with the superintendency over public officers. Every officer was the deputy of the sovereign: the condition of the tenure was good behavior, and on the breach of such condition, the King, as the general patron of official franchise and the representative of the public interests, was empowered, in the mode prescribed by the law, to have a forfeiture of the office declared." State ex rel. v. Pritchard, 36 N. J. Law, 101.

But even the King was required to resort to the mode prescribed by law, and a court was empowered to return a decree forfeiting an office as a condition precedent to removal and appointment of the King's selection.

"But none of these royal prerogatives, which so appropriately embrace an absolute control over all public offices, are to be found among the powers which go to make up the authority of the executive of this state." Idem.

"Neither theoretically nor in practice is the executive the fountain of office." Idem.

"Nor are public offices franchises of the executive, nor does he distribute them among his deputies." Idem.

"According to the policy of this commonwealth, all public office proceeds, in theory and in fact, from the people." Idem.

There is marked distinction between the powers of the President and those of the Governor, and for this reason this court has declined to accept the federal rule stated in the Myers Case, but prefers to follow the one suggested by the statement of it in converse in the case of Cameron v. Parker, supra, and City of Ardmore v. Sayre, 54 Okla. 779, 154 P. 356, which is that, where prohibited, the appointing agency has no power to remove.

There is contained in the terms of the Highway Act under consideration a prohibition against removal, and, as apparent from a survey of the powers of the Legislature, that department of state, possessed of the residuary powers of government granted by the sovereign people to the government, and possessed as it is of this power to provide for the appointment to, and this power to provide for the removal from, an office created by the Legislature, the authority is its to exercise, or to confer as it sees fit. In other words, the department of government most liberally bestowed with powers from the citizen, and thereby most nearly approximating the sovereignty, possesses the authority to delegate the power of appointment and the corresponding power to deny and prohibit the exercise of the removing power.

From whence comes the power of the Governor to appoint such a Highway Com-

missioner? The inevitable answer is: From the legislative act in the name and by the authority of the people of the state of Oklahoma. Then, if it be a proper act to give it in whole, it must be a proper act to give in part or with restrictions, as was done, i, e., "by and with the advice and consent of the Senate." And if it be proper to restrict the exercise of appointive power, it would seem proper to restrict or extend tenure of office, subject to the limitation contained in the Constitution. In other words, the Legislature's authority under section 36, art. 5, Constitution, may be exercised by denying to the executive the power to remove an executive officer for reasons of policy, thus divorcing a branch of the administrative or executive department of the state from vicissitudes of partisan politics (such as the Board of Regents of the University of Oklahoma, or the State Board of Agriculture except as to the President). The proper exercise of this authority is by the creation of a definite term of office and the establishment of just causes for removal, and the selection of an agency to hear and determine the sufficiency of the causes of some one of them. A proper modification of this is the limitation of the period of time embraced in a term, at the end of which a new personnel may be selected. A modification of the modification is to stagger the terms of office whereby the personnel of a board is not inexperienced as a whole at any one time. All this the Legislature has done by this act.

Section 1, art. 16, of the Constitution of Oklahoma directs the Legislature "to establish a Department of Highways" and empower it "to create improvement districts and provide for building and maintaining public roads."

The Constitution did not create, but directed the Legislature to create a Department of Highways. The Legislature possesses the power to create a Department of Highways in the absence of the constitutional provision. The function of the constitutional provision is a simple direction of duty. The Legislature has performed that duty. In performing it, the Legislature created "other (executive) offices provided by law," as authorized under section 1, art. 6, Const., and in view of the mandate of the Constitution that the officers so provided "shall perform such duties as may be * * * prescribed by law" (Idem) the Legislature by law prescribed the duties of the office by it created. Now the Legislature may have bestowed the duties of the Highway Department upon the Governor, but it did not. The Legislature might have declined to prescribe the duties of the new offices created

or it might have provided the duties of the new offices created were to be such as the Governor saw fit to direct, thus to have made the Highway Department his alter ego, but it did not. What the Legislature did do was to create a department, as distinguished from a subordinate agency, as it was directed by the Constitution to do. It placed it upon a plane with other departments of the executive branch of state government; such as the Corporation Commission, the State Auditor, the Commissioner of Charities and Corrections, the Attorney General, the State Treasurer, the Secretary of State, and others by the Constitution created. It prescribed the duties of the office, and apparently it purposely omitted to require the Highway Commissioners to obey the mandates of the Governor. The Governor, by the act, was given no power to prescribe the duties to be performed by the department or its officers. But such officers are obligated only to "perform such duties as may be designated in this Constitution or prescribed by law." (Section 1, art. 6, Const.)

The act approved April 1, 1929, repealed chapter 71, S. L. 1927, and the latter act repealed only section 1, ch. 48, S. L. 1923-4. Thus leaving undisturbed the duties prescribed by law, **not by the Governor,** to be performed by the State Highway Commission. By that enactment the "Commission is hereby vested with the powers and duties necessary and proper to enable the Commission to fully and effectively carry out all of the objects of this act." The duties thereby described for the State Highway Commission are:

1. The supervision of highways and bridges constructed, improved, or maintained by the state.

2. To prescribe rules and regulations fixing duties of its employees and to prescribe the manner of co-operation between municipal subdivisions and itself.

3. Investigate and determine methods of road and bridge construction to the best interest of the state.

4. To aid in promoting highway improvement and maintenance throughout the state.

5. To let or supervise the letting of all contracts for construction or improvement of state highways or any contract for road and bridge construction or improvement where the work is being done in whole or in part with federal moneys.

Section 3 of the Act of 1924 authorized the Commission to employ an engineer, "who shall hold office at the pleasure of the Com-

mission," and to appoint such assistant engineers and clerical help as may be by the Commission deemed necessary for the proper discharge of the duties of such office.·

Section 4 directs the Commission to appoint a secretary, who shall serve at the pleasure of the Commission. The duties of the secretary are thereby prescribed and made to be under the direction of the Commission.

Section 5 authorizes the Commission to employ such other assistants and clerical help as may be in the judgment of the Commission necessary.

Section 9 of the act empowers the Commission on behalf of the state "to enter into any arrangements or contracts required by the duly constituted federal authorities, in order to secure the full co-operation of the government of the United States, and the benefits of all present and future federal allotments in aid of highway construction, reconstruction, improvement or maintenance."

This is a valid provision in view of section 8, art. 6, Constitution. For while it is made the duty of the Governor to "conduct in person or in such manner as may be prescribed by law all intercourse and business of the state with other states and with the United States, * * *" yet this is a provision by law for the manner of the conduct of the relation of state and federal government pertaining to intercourse and business relating to arrangements or contracts to secure the co-operation of the federal government and to secure allotments of federal aid for construction, reconstruction, improvement, and maintenance of highways.

In the conduct of such business with the federal government, the State Highway Commission functions as the agent of the Governor and is expected to expedite and consummate the state-federal intercourse and business. When the Governor acts in person in regard to state-federal intercourse and business pertaining to highways, he functions to execute the business authorized by law, and under the present law the discretion as to highway construction is vested in the Highway Department. That department determines when, where, and how highways within this state are to be built. So, in fact, in such relations, while the Governor in person may execute the contracts relating to such business or be a party to the intercourse with the federal government, the state's determination of the business is by law vested in the Highway Department, and so the Governor is simply an agent to expedite and consummate the business that arises under the law and by virtue of the Constitution. There is no specific provision, but a general one contained in section 2 of the Acts of 1923-24, c. 48, broad enough to authorize interstate relations concerning highway and bridge construction.

In these particulars only is the State Highway Commission subject to direction of the Governor, and that is not a confidential relation, but one concerning the expenditure of public funds.

A literal construction of the constitutional provision cited empowers the Governor either to conduct such business in the manner provided by law, or if that is not to his liking, he may transact such business in person.

There are many instances where other state officers are subject to the Governor's direction, nevertheless they are not at all times under his domination or within his control; i. e,, the Attorney General may be directed to defend or prosecute the interest of the state. The Governor may require information from any office or department (and he has required it from all members of this court). It does not follow that a refusal to perform would give the Governor power to remove from office, but mandamus or impeachment, or removal as provided by law, is the remedy, and the provision of law as applied to the office under consideration is that the court shall exercise the power and ascertain the sufficiency of the grounds provided and relied upon.

"The Constitution has made the law and not the will of the executive the rule to which all its officers are bound to conform and to which they are amenable." Field v. People, supra.

Chapter 245, S. L. 1929, p. 312, amends section 10 of the Acts of 1923-24, and prescribes additional duties, no one of which concerns the Governor. This same act, chapter 245, S. L. 1929, amends section 1, ch. 82, S. L. 1927, so as to vest "sole discretion" in the Highway Commission, either to "drain or grade or hard-surface, or construct, or maintain any necessary roads, bridges, over-passes and under-passes, on any highway, street, or alley within incorporated limits of any city or town which highway, street, or alley is a continuation of the state highway system."

And provision is made:

"That such discretion shall in no event be controlled by any other authority."

Either:

"as to the manner, or time, or place."

Thus the Legislature evidenced its de-

sire, intent, and purpose, so far as the building of state highways within certain municipal subdivisions are concerned, of a complete separation from dictation of "any other authority," and that phrase quoted includes the Governor. This is a valid and effective provision and serves to remove all responsibility in connection with such work of the department from the Chief Executive. In this regard the Governor has no power to direct or control the work of the Commission, nor in any other regard or connection except as specified in the Constitution and laws of this state.

"The Governor is responsible for the selection of competent and faithful officers. But he is under no further responsibility for the faithful discharge of their duties, but as he may be authorized by the Constitution or laws to direct and control them." Page, Second Auditor, v. Hardin, 47 Ky. 648.

In no regard can the Governor control the Highway Commissioner's act. He may inquire for purposes of recommendation to the Legislature, he may urge, but in event they refuse his request or direction his remedy is to act in person, and then he is limited to powers specifically granted by the Constitution and arising by virtue of the law. When and if he overrides in arrangements or contracts with the federal government, he is then dependent upon the law and the Legislature for the fulfillment of the obligations undertaken, and it must be remembered that the Legislature is possessed of the purse with which to meet obligations and of the power, with considerable liberality, to enact the law so as to vest powers and duties solely within any one of the many officers constituting the plural executive department of government. The law as written provides that sole responsibility for the construction and maintenance of highways and the expenditure of funds appropriated therefor is vested in the Highway Commissioners and not the Governor.

Thus the authority of the Governor under section 8 of art. 6, Constitution, to "cause the laws of the state to be faithfully executed" vests no power in the Governor to make the law, to construe it, or to remove a Highway Commissioner. Field v. People, 3 Ill. 79.

The last-quoted clause of the Constitution is a declaration of a general rule. It confers no specific power, not does it enjoin any specific duty. The enumeration of powers of a department of the government (unless to the contrary provided, as in section 36, art. 5, relating to the Legislature) operates as a limitation and restriction of a general grant. When we look to the divisions of power to see what powers are clearly granted, and when we bear in mind (1) that powers by implication can only be claimed as necessary to the exercise of one expressly granted, (2) and when we look to the structure of the executive branch of government with its parceled out executive power, with its duties defined in the Constitution and laws and not resting in the policies of the Chief Executive, and with its responsibilities for performance of duties centered upon the respective executive officers, and when we recognize the general policy of removal by impeachment or for cause based upon specified grounds, we conclude that power of removal of members of the Highway Commission is not essential to the exercise of any power conferred upon the Governor.

The prerogative of removal as applied to officers for whose duty the Governor is not responsible is not specifically conferred upon the Chief Executive and it cannot arise by implication, for neither the executive nor the judiciary can exercise any authority or power, except such as is clearly granted or such as arises by necessary implication of a grant.

Now, as applied to the King, the rule was different. When a question of prerogative concerning the King arose, recurrence was had to the charters of the people's rights and liberties, to ascertain whether the right in question had been surrendered by the King to the people; and if the grant could not be shown, the right was adjudged to the King, upon the principle that all rights of which he had not divested himself, by express grant to the people, came within his prerogative. But, upon the principle of our government that the sovereign power of the state resides in the people, and that only such powers as they have delegated to their functionaries can be exercised, where a claim of power is advanced by the executive, the question is, not whether the power in question has been granted to the people, but whether it has been granted to the executive, and if the grant cannot be shown, he has no title to the exercise of the power.

"It would be dangerous * * * to treat this clause (the Governor shall cause the laws of the state to be faithfully executed) as conferring any specific power which he would not otherwise possess. It is to be regarded as a comprehensive description of the duty of the executive to watch with vigilance over all the public interests." Walker, Am. Law, 103.

"The Governor is not to execute the laws himself, but to see them executed. This

duty is performed by lending the aid and power of the executive arm to overcome resistance to the law. * * *

"The executive is to see the laws executed, not as he may expound them, but as they may be expounded by those to whom that duty is entrusted." Field v. People, supra.

The federal and state courts adopt this view. It is sound. Any other view leads to despotism and counteracts "the whole scope and design of the Constitution, by substituting the changing and capricious will of one man for the fixed and known rules of the law." (Holder v. Anderson, 160 Ga. 433, 128 S. E. 184.)

Our construction of the law now before us is "that where no other power than that of appointmtnt is given," such as contained in the Act of April 1, 1929 (and even that is modified by requiring the advice and consent of the Senate), "none else can be exercised, unless where the appointee is the mere agent, and bound to execute the will of the appointing power." The Highway Commissioners are not so bound. People v. McCullough, 254 Ill. 9, 98 N. E. 158; State ex rel. Standish v. Boucher, 3 N. D. 409, 21 L. R. A. 544: Peo. v. White, 334 Ill. 465, 166 N. E. 105; Witter v. Cook Co., 256 Ill. 616, 100 N. E. 148; Terr. v. Ashenfelter, 4 Johns. (N. M.) 85, 12 P. 879; Holder v. Anderson, 160 Ga. 453, 128 S. E. 184.

The power to appoint to office does not exist in the Governor as an implied executive function. State ex rel. Standish v. Boucher, supra. But under our Constitution and laws, where it was desired that such power be exercised, express provision for its exercise was made.

As to expressed power to appoint, note the one provision for original appointment, section 1, art. 14, Constitution, Bank Commissioner; and the provision for filling vacancies on the Supreme Court, section 3, art. 7, Idem., "until the next general election of state officers"; and section 15, art. 9, providing for the filling of vacancies in the office of the Corporation Commissioner, none of which provisions requires the consent of the Senate.

The only general power of appointment vested in the Governor is contained in section 13, art. 6, Constitution, which provides:

"When any office shall become vacant, he shall, **unless otherwise provided by law**, appoint a person to fill such vacancy, who shall continue in office until a successor shall have been duly elected, appointed and qualified according to law."

In this regard our provisions are far different from those of the federal Constitution contained in section 2 of art. 2, federal Constitution, vesting the power in the President to nominate and by and with the consent of the Senate to appoint all superior officers of the United States. Except as stated, the Constitution of Oklahoma vests no power of appointment in the Governor, and consequently, otherwise than by the Constitution provided, the Legislature may select the proper appointing power, or it may provide for the office to be filled at popular election by the people.

Not so with Congress (Willoughby on the Constitution, vol. 2, sec. 695; U. S. v. Germaine, 99 U. S. 508, 25 L. Ed. 482; U. S. v. Smith, 124 U. S. 525, 31 L. Ed. 534), for "an officer of the United States can only be appointed by the President, by and with the advice and consent of the Senate, or by a court of law, or the head of a department."

In the absence of constitutional provision the method of filling offices is to be determined by the Legislature. 46 C. J. 950; 22 R. C. L. 426; sec. 36, art. 5, Const.

So that the power to appoint to office is not per se an executive function. 12 C. J. 836. And the Legislature, where not inhibited by the Constitution, may vest the power of appointment at its discretion. Riley v. State, 43 Okla. 65, 141 P. 264.

In the cited Oklahoma case it was held:

"Generally the power to select officers of the state is not an exclusive function of either the executive, legislative or judicial branches. Primarily, the power resides in the people, and they alone are authorized to say by what instrumentality the power may be exercised." Dunbar v. Cronin, 18 Ariz. 583, 164 P. 450; State ex rel. Standish v. Boucher, supra; State ex rel. v. Prater (N. D.) 189 N. W. 334; People v. Shawver (Wyo.) 222 P. 29; Peo. v. McCullough, 254 Ill. 9, 98 N. E. 156; Richardson v. Young, 122 Tenn. 471, 125 S. W. 664.

But the power of election or appointment to office is a political power, not inherently legislative, executive, or judicial, but which may be vested with equal propriety in either of them, for "all political power is inherent in the people." Section 1, art. 2, Bill of Rights, Const. of Oklahoma.

The Legislature represents the whole power and authority of the people, except when they have withheld or limited such power, or have conferred it upon some other department. People v. Freeman, 80 Cal. 233, 13 Am. St. Rep. 122; Trav. Ins. Co. v. Oswego, 59 Fed. 58; Cox v. State, 72

Ark. 94, 105 Am. St. Rep. 17; Elliott v. McCrea, 23 Idaho, 524, 130 P. 785.

Since the appointive power is not per se in the Governor as an executive function, and since the Legislature, in an office created by it, may withhold the appointive power from the Governor, it is as logical and more reasonable that the removal power likewise may be withheld from the executive, at least where he is not responsible for lack of performance of the duties of the office nor charged with the obligation of outlining duties for such officers. The power to remove for cause contemplates that some authority will hear and determine accusation against the incumbent charged and render if established a condemnation far-reaching in its effect, whereas the power to appoint merely contemplates a choice or selection based upon fitness to discharge the duties of office. State v. Rhame (S. C.) 75 S. E. 881, Ann. Cas. 1914B, 524; Markey v. Schunk, 152 Iowa, 508, 132 N. W. 883; 46 C. J. 984.

It is our expressed view that the appointive power (and correlated removal power) is not an executive function, generally, granted by the terms of our Constitution. Nor is it an executive power, generally, incident to any specific power granted the Chief Executive. It is a sovereign power —the right to choose a leader.

With society capable of self-government, its source is the people. By basic law, whether Constitution or charter, usually this power to appoint officers is delegated. As applied to the states, it is generally possessed and exercised by the Legislature or assembly consisting of representatives of the people. Such was the custom in Rhode Island for years after its entry into the Union. Frequently even after entry into the Union the provision was that the judges were chosen by the Assembly. In the absence of inhibition, the Legislature may again delegate the appointive power to a proper agency; e. g., S. L. 1931, p. 24, ch. 21 [O. S. 1931, secs. 3789-3791] providing for the appointment of law clerks by Justices of the Supreme Court. Frequently ill-advised delegations of the power occur; e. g., S. L. 1931, p. 265, ch. 66 [O. S. 1931, sec. 1645] providing for appointment by district judge of a member of the board of equalization who is an ex officio member of the excise board. His duties pertain to administration of the general government. He is an executive officer. He possesses no characteristics of a judicial officer. We use the words "ill-advised" advisedly. We do not hold the act of delegation unconstitutional. The reason for the use of the words expressing our view is that patronage should be a thing foreign to courts. The courts must perform the most delicate of duties; its token is the scales of Justice—they are not to be balanced by patronage. The judiciary is physically the weakest of the departments of government—it is possessed of neither the purse nor the sword. The only voice it knows is that of law. There is no provision in the act, supra, for the removal of the officer. Can it be that the power to appoint carries with it the power to discharge? If this appointee is removable by the ipse dixit of the judge, then he is the judge's alter ego and is expected to conceive the judge's executive policy (whereas fundamentally the judge cannot have an executive policy). Moreover, the appointee being the judge's alter ego, and having conceived the judge's alien judicial views, when an issue concerning them is judicially before the court, the judge will be expected to nurture and sustain the same, thus to debauch himself as a judge. We repeat such is an ill-advised delegation of appointive power.

Nevertheless recent legislative and executive history (for this bill was sponsored and signed by the present Governor) shows that the people of our state are not concerned so much with the manner of appointment as with the exercise of power and discharge of the duty of office. In re Impeachment of J. C. Walton, Governor; In re Impeachment of Henry S. Johnston, Governor.

In foreign lands, based on lack of ability for self-government or a desire to suppress repercussions always present in manifestations of public clamor incident to elections, or economy in public expenditures or selfishness and glory of those in control, the selection of officers is often left to the vagaries of heredity rather than a popular vote.

From those so selected in the past emanates the theory of divine right to rule, to further suppress self-expression of the multitudes upon whom the state is builded. But our patriotic forefathers put aside such theories and discarded these foundation stones in our social structure, adopting the principle: Governments derive "their just powers from the consent of the governed," which is inclusive of the right of the governed to choose the leader or leaders or to provide, as they may see fit, for the selection of all officialdom. This is the appointive power—it is a sovereign power, neither executive, legislative, nor judicial, but inclusive of all the attributes of political power.

Ours is a government of laws and not

of men. Such was the predominating idea cast in the construction of our governments both state and federal, for:

"No man was to be so high above the law that he could not be reached by judicial process. If this was not true to all alike, the Executive would then be at liberty to exercise his duties in any manner he might see fit, possibly, and more likely, to his own selfish gain and he would not be held accountable, as the Constitution would afford him this protection." The Appointing and Removal Power of the President (U. S. Gov. Ptg. Office [1929] p. 7).

John C. Calhoun stated that executive patronage "is but a necessary evil: that its tendency where it is not effectually checked and regulated is to debase and corrupt the community," and that unless checked "it is a certain indication of the near approach of irresponsible and despotic power." Likewise he said that too great an executive power being vested in a single individual is destructive to a sound government—which observation was heeded by the assemblers of our Constitution, who selected the plural executive idea for submission to our people, who were pleased to adopt it under the slogan of "Let the People Rule."

Were the construction otherwise, as Calhoun said in 1835, and:

"Were a premium offered for the best means * * * to destroy the love of country and to substitute a spirit of subservience and man worship; to encourage vice and discourage virtue, and, in a word to prepare for the subversion of liberty and establishment of despotism, no scheme more perfect could be devised." Idem, p. 54.

Mr. Clay rallied to the call of Calhoun with the view that the adverse idea was:

"A revival of the institutions of feudal times filling the land with barons of feudation."

Mr. Webster exactly analyzed executive power and inquired whether it "can be supposed" that the written Constitution "conferred it in the lump." He sought its boundaries and its limitations. "Did they mean executive power as known in England, or as known in France, or as known in Russia? Did they take it as defined by Montesquieu, by Burlamqui or by DeLolme?" The statesman answered his inquiry by pointing out that while the framers of the Constitution meant to confer executive power on the Chief Executive, yet they meant "to define and limit that power and to confer no more than they did thus define and limit."

The federal government with the singular executive doctrine, he said, intended the selection of one magistrate to be called a President, who shall hold executive authority, "but they mean further that he shall hold his authority according to the grants and limitations of the Constitution. They did not intend, certainly, a sweeping gift of prerogative. They did not intend to grant the President whatever might be construed or supposed or imagined to be executive power; and the proof that they meant no such thing is that immediately after using these general words they proceeded, specifically, to enumerate his several distinct and particular authorities; to fix and define them; to give the Senate an essential control over the exercise of some of them; and to leave others uncontrolled. By the executive power conferred on the President, the Constitution means no more than that portion which itself creates, and which it qualifies, limits and circumscribes."

We accept, adopt and approve the reasoning of Mr. Webster as applied to the executive power possessed by the Governor of the state of Oklahoma under the Constitution of this state.

As Mr. Justice Miller in Langford v. U. S., 101 U. S. 341, well said:

"The maxim, that the King can do no wrong, has no place in our system of constitutional law as applicable either to the government or to any of its officers."

See, also, Goltra v. Weeks, 271 U. S. 550; Lane v. Hoglund, 244 U. S. 182.

In Federal and State Constitutions, by Stimson, p. 7, the passage of sovereignty from the King to Parliament, and the existence in America of sovereignty in the people themselves, is reviewed. The author points out that the great principle of separate powers was suggested by the practical working of things in England, but that it had never been formally embodied in the Constitution of any country except our own, and that it is based upon the principle that those who make the laws may not administer them, and and he who administers them may not judge them, "to the end that it be a government of laws and not of men."

He then says: "Lastly, with us the people are sovereign; not as in England, the Parliament; nor as in continental countries, the King, and this led logically to the invention and the functions of our Supreme Court. * * * But in England we had the history of the judgments by the courts, of the King's own acts, and those of his officers under his orders. 'What power the king hath, he hath but by law.' This English heritage, joined with the logic of our Constitution, led to the creation of our great tribunal. When a people has granted to

its government only certain powers, it may not trust to the wisdom of that government to judge of its own oversteps. When it has parceled out those powers between Congress and executive, between federal government and state, neither branch, neither forum, may safely be entrusted to determine its own power or limit its own realm." This rule is applicable to the Governor of Oklahoma.

If this were permitted, the frailties of human nature would render it certain that the branch of government permitted so to do would enlarge its own powers and extend its own realm until all powers were centered on that branch, and the other branch of government would be entirely stripped of all its legitimate powers. The people of this state have, by their Constitution, said: "All political power is inherent in the people; and government is instituted for their protection, security and benefit and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States." Section 1, art. 2, Constitution.

The people have adopted our Constitution and declared that it shall stand until we, the people, by amendment alter it. Beside the executive and legislative branches of government they have placed the judicial branch. All are bound alike by the Constitution. They are equally bound by valid laws enacted under the Constitution.

Therefore, the maxim, "The King can do no wrong," has no place in our system of constitutional law, and as applicable to the government or any of its officers.

If the principle, as applied to governmental functions, that no wrong can be done applies anywhere in our system, it applies to the people acting together, and then only in the manner and mode established by basic law. For in the people, and in the people alone, rests the power to alter or change our Constitution.

"Where a case is tried on an agreed statement of facts, the appellate court is as competent to consider such facts and apply the law as the trial court. There being nothing to weigh as to the credibility of witnesses, the appellate court will determine the law on the facts agreed to, and may render such judgment as the trial court should have rendered." Consol. Steel Wire Co. v. Burnham, Hanna, Munger & Co. (Aug. 24, 1899) 8 Okla. 514, 58 P. 654.

In Goodwin v. Kraft (March 9, 1909) 23 Okla. 329, 101 P. 856, it was said:

"In a case triable in this court on review on an agreed statement of facts, this court, not being concerned with the credibility of witnesses or the weight of their testimony, will apply the law to the facts as a court of first instance."

We quote from the body of the opinion:

"In considering this case, let us first inquire as to what is our duty as an appellate court concerning it. We take it that the case is practically triable by us de novo; that, being before us on an agreed statement of facts, this court is not concerned with the credibility of witnesses or the weight of their testimony, but the facts being determined, 'we are as competent to apply the law to the facts found as was the trial court.' Con. Steel & Wire Co. v. Burnham, Hanna, Munger Co., 8 Okla. 514, 58 P. 654. That being true, we will lose sight of the judgment of the lower court, and determine the questions involved as though we were a court of first instance."

See, also, Railroad Co. v. Butts, 7 Kan. 308; Brown v. Evans, 15 Kan. 88.

"Some of the courts hold that a new trial cannot be granted in such case, but that the appellate court must enter the correct judgment (Martin v. Martin, 74 Ind. 207; Harrington v. Hilliard, 27 Mich. 271)." Consol. Steel & Wire Co. v. Burnham, etc., supra.

By our decision the order sustaining plaintiff's demurrer to the cross-petition is reversed. Judgment is now rendered upon the pleadings and agreed statement of facts vesting title to the office and right of possession thereto in Lew H. Wentz, and Maude O. Thomas is restrained and prohibited from interfering with defendant's possession of the office, and the clerk of this court is directed to issue a special mandate to the court below to award the necessary writs whereby the judgment here rendered may be enforced. Section 801, C. O. S. 1921 [O. S. 1931, sec. 549]; Moore v. Calvert, 8 Okla. 358, 58 P. 627.

SWINDALL, J. I concur in the views expressed in the special concurring opinion of Mr. Justice RILEY for the reason that I feel that the elaboration by him may be the means of preventing other actions being commenced in this court.

CULLISON, J., concurs.

---

ANDREWS, J. (specially concurring). My views with reference to the principal issue presented by the record in this case are so much in accord with the views of Wilson, Chief Justice, who delivered the opinion of the Supreme Court of Illinois in the case of Field v. The People of the State of Illinois

ex rel. McClernand, 3 Ill. 79 (2 Scammon, 79), that I deem it proper to quote at length from the opinion in that case.

In that case one Field had been appointed Secretary of State in 1829 and had continued in the discharge of the duties of that office. In the year 1838 the Governor appointed one McClernand Secretary of State. With reference to the importance of the issue presented, the court said:

"To the parties immediately before the court, the case is of some interest; but it derives its great importance from the fact, that the fundamental principles of the government are drawn in question."

And with reference to the determining factor, the court said:

"In deciding who is entitled to the office of secretary, it becomes necessary to decide whether the Governor of this state possesses the constitutional power of dismissing from office the Secretary of State, and appointing a successor, at his will and pleasure. For, upon the validity of the Governor's claim to this power, depends the appellee's title to the office of Secretary of State, which he claims under an appointment from the Governor."

The issue presented and decided, in the language of that court, was:

"* * * Does the Governor possess the constitutional power of removing from office the Secretary of State, and appointing a successor, at will?"

With reference to that issue the court said:

"In deciding this question, recurrence must be had to the Constitution. That furnishes the only rule by which the court can be governed. That is the charter of the Governor's authority. All the powers delegated to him by, or in accordance with, that instrument, he is entitled to exercise, and no others. The Constitution is a limitation upon the powers of the legislative department of the government; but it is to be regarded as a grant of powers to the other department. Neither the executive nor the judiciary, therefore, can exercise any authority or power, except such as is clearly granted by the Constitution."

The court was of the opinion that the practice of analogous governments was entitled to respect, but that the practice of governments widely different in theory and principle are incongruous and inapplicable. It pointed out the differences between practice of the federal government and that of the state, and said:

"The general government differs from ours in its powers and attributes; and although we have adopted the common law of England, we have neither adopted the form of that government nor recognized the principles upon which it is founded. According to the theory of that government, the king is the sovereign power of the state. When a question of prerogative, therefore, arises there, recurrence is had to the charters of the people's rights and liberties, to ascertain whether the right in question has been surrendered by the king to the people; and if the grant cannot be shown, the right is adjudged to the king, upon the principle that all rights of which he has not divested himself, by express grant to the people, come within his prerogative. But upon the principle of our government, that the sovereign power of the state resides in the people, and that only such powers as they have delegated to their functionaries can be exercised, where a claim of power is advanced by the executive, the question is, not whether the power in question has been granted to the people, but whether it has been granted to the executive; and if the grant cannot be shown, he has no title to the exercise of the power.

"As the right of the Governor to remove the secretary must be granted by the Constitution, or it does not exist, it therefore devolves upon those who advocate the claim of the executive power to show the grant upon which it is founded; to point out the clause and section of the Constitution from which it is derived. How has this been done? Has any express grant been produced? No; it is not pretended that any express grant is to be found in the Constitution. But it is contended that the power in question is granted to the Governor by implicaton."

It discussed the various constitutional provisions which it was contended granted to the Governor the power by implication. With reference thereto it said:

"The first and second sections of the first article of the Constitution divide the powers of government into three departments, the legislative, executive and judicial, and declare that neither of these departments shall exercise any of the powers properly belonging to either of the others, except as expressly permitted. This is a declaration of a fundamental principle and although one of vital importance, it is to be understood in a limited and qualified sense. It does not mean that the legislative, executive, and judicial power should be kept so entirely separate and distinct as to have no connection or dependence, the one upon the other; but its true meaning, both in theory and practice, is, that the whole power of two or more of these departments shall not be lodged in the same hands, whether of one or many. That this is the sense in which this maxim was understood by the authors of

our government, and those of the general and state governments, is evidenced by the Constitutions of all. In everyone, there is a theoretical or practical recognition of this maxim, and at the same time a blending and admixture of different powers. This admixture in practice, so far as to give each department a constitutional control over the other, is considered, by the wisest statesmen, as essential in a free government, as a separation. This clause then, is the broad theoretical line of demarcation between the three great departments of government. But we are not therefore, when a question arises as to the extent of the powers of either, to confine our views to this general clause, which confers no specific powers. We should look to the division as actually made, to see what powers are clearly granted; for such only can be exercised. As no power, then, is granted to the Governor by these sections, it necessarily follows that none can be implied. A power by implication can only be claimed as necessary to the exercise of one expressly granted.

"The next grant of power relied on, is, that 'the executive power of the state shall be vested in a Governor.' This clause is treated by the court below as conferring numerous and ample powers upon the Governor. All that are usually denominated executive powers, by theoretical writers, are supposed to be included in this grant to the Governor, except such as are expressly conferred upon other departments. This, I think I shall be able to show, is a mistaken view of the subject. This clause, like the preceding ones, is a declaration of a general rule; and the same remarks are applicable to this, as a grant of power, that have been made in reference to them. It confers no specific power. What would have been its operation, if the Constitution had contained no specific enumeration of executive powers, is a very different question from that now presented, and might have admitted of a different answer. But it has been settled by the Supreme Court of the United States that an enumeration of the powers of a department of the government operates as a limitation and restriction of a general grant. It has also been laid down by the same high authority 'that the general principles contained in the Constitution are not to be regarded as rules to fetter and control, but as matter merely declaratory and directory; for even in the Constitution itself, we may trace repeated departures from the theoretical doctrines that the legislative, executive, and judicial powers shall be kept separate and distinct.' (Peter's Cond. R. 445.)

"This departure from the general theory is much greater in our Constitution than in that of the United States. The reasoning, therefore, of the judge of the Supreme Court of the United States must apply to it with a correspondingly increased force, and exclude all claim of power from this general declaration.

"The authority of the Governor to require information from the officers in the executive department relative to the business of their respective offices, and the obligation of the secretary to keep a register of his official acts, are relied upon, in connection with the injunction that the Governor shall see that the laws are faithfully executed, as implying an authority in him to dismiss the secretary. Let it be conceded that the secretary is one of the executive officers of whom the Governor may require information, does this imply a right to dismiss him from office? If it does, then by the same rule the general assembly may dismiss the Governor from office; because he is under a constitutional obligation to give them information of the state of the government; and the obligation upon him to give the information implies a right in them to demand it. The object of the information is the same in both cases. It is intended to aid the Legislature in their deliberations, and the obligation to communicate it is as imperative upon one officer as the other. The same reasons, therefore, that would subject the secretary to removal, under this provision of the Constitution, will apply, with equal force, to the case of the Governor. The Constitution has made no distinction, and recognizes no executive standard of obedience or responsibility to its precepts.

"If the right to require information from an officer implied the right to remove him, the Legislature would have the power not only to remove the Governor, but a power, concurrent with him, to remove all the officers in the executive department; for the Legislature has, under its general powers, authority to call on all of them for official information.

"The Governor's authority to call upon the secretary and other officers in the executive department is indisputable; and his authority to enforce a compliance with his call is equally clear. But to do this, he must have recourse to the mode prescribed by law; he cannot, at discretion, adopt means unknown and unauthorized by law. The performance of a duty enjoined by law may be enforced by its process; and the rule that when an instrument gives a power it also gives, by implication, the means necessary to its exercise, is intended to render available those grants of power which, without its application, would be inoperative and nugatory, by reason of the means necessary to their exercise not being also provided. But when the means of enforcing a given power are furnished by law, the rule does not apply. It cannot, therefore, apply in the present case. The duty of the secretary to give the official information required, and to register the official acts of

the Governor, is a legal injunction; and the law has provided ample means for enforcing its observance: First, by a private action, for any private injury that may possibly result from his neglect of duty; and secondly, by a mandamus, by which a specific performance of the duty may be enforced; and, lastly, if his contumacy should be thought to deserve it, he may be impeached, and, upon conviction, dismissed from office.

"* * * But these remedies, which the law has expressly prescribed as the means of securing an observance of official duty, the circuit court considers inadequate to insure that dispatch and promptitude which the executive may demand, and the interest of the public require; and, by way of illustration, supposes the case of the secretary refusing to put the seal of state to the internal improvement bonds, or to keep a register of the official acts of the Governor, and inquires whether, in such cases, the Governor must submit to the law's delay? I think it may be safely answered that he must; that in a government of laws all are bound to submit to the law; and neither the executive nor any other functionary can stretch his powers beyond it, in order to obviate an imaginary inconvenience or defect. The forms of the law are the outworks by which the citadel of liberty and the rights of person and property are defended; and when they are broken down, the fortress itself must soon surrender.

"Official responsibility is essential to a correct administration of the law; and if that object is not effected by the remedies already provided, it is the province of the Legislature to provide such as are more ample and efficacious. But this is alike beyond the remedial powers of the executive and the judiciary. Their appropriate functions are to expound and execute the law. In the exercise of the first of these functions, it is laid down as a rule of great importance in reference to a Constitution, 'not to enlarge the construction of a given power beyond the fair scope of its terms, merely because the restriction is inconvenient, impolitic, or even mischievous.' (1 Story on Const. 409.) * * *

"If this prompt remedy of dismissal from office may be applied to these officers, because a mandamus or impeachment would be too dilatory a proceeding to suit the exigency of the case, why should it not be applied to state's attorneys and judges? Suppose a state's attorney should refuse to perform his duties, or a judge to hold court; the Constitution, which requires a speedy administration of justice, would be violated, and the end and object of government defeated. But it cannot be contended that the Governor may apply a remedy by dismissing these officers for neglect of duty and appointing others. Yet the injury to

the public is at least as great as any that can result from the secretary's neglect of his duty; and the means of redress are at least as tardy and as remote. Again, suppose the Governor should refuse to put his signature to the commissions of officers legally appointed; upon the happening of such an event, the machinery of the government would be stopped, or greatly retarded, for the want of officers to execute the laws. But where is the remedy, except by address or impeachment? What do these examples, and many others that might be instanced in addition to these, and those put by the circuit court prove, but that every delegated trust is more or less liable to abuse, and that if we elect to be governed by the permanent and known rules of a Constitution, rather than the capricious and arbitrary will of one, or more, we must wait the time necessary to carry them into operation? That, according to the principles of law and justice, a conviction for crime or delinquency must precede punishment, we must delay its infliction until the accusation is legally proven? In despotic governments, where the will of the ruler is the law of the land, there is no delay between its promulgation and execution. The quickening influence of fear, the principle upon which such governments are founded, reaches every department, and keeps the head of every functionary, from that of the Bashaw to the Cadi, always in danger.

"Upon a doubtful question, where the scales are equipoised, policy and convenience may be allowed a preponderating influence; but they cannot be regarded as the legitimate source of power, without violating the settled rules of construction, and subjecting the Constitution to fluctuate and change, with the changing opinion of men, of times, and of parties. This would defeat the objects of its creation. It was intended as a fixed and permanent rule of government, and without the attribute of certainty it would be of no value; we could not tell from what has been decided, how the same question would be decided again.

"But does policy sanction a concentration of power in the hands of one man, to be used at discretion? This doctrine is contrary to the opinions of the ablest writers upon government, and is also opposed to the Constitution, which has divided and subdivided the powers of government, and as far as practicable, made one a check upon another. And upon the principle that arbitrary, discretionary power is more liable to abuse than that regulated by law, the Constitution was made the law, and not the will of the executive, the rule to which all its officers are bound to conform and to which they are amenable. * * *

"The injunction that the Governor shall see that the laws are faithfully executed,

it is also urged, gives him the control, and consequently the power of removal of the officers of the executive department. This inference is not justified by the premises. It has neither the sanction of authority nor the practice of other state executives; both of which are opposed to it. The practice of the President, as I will show, is founded upon other grounds, and his power does not extend to the removal of any officers whose offices are created by the Constitution, and whose duties are regulated by law. But as this position has been earnestly urged, and relied upon, I will examine it more fully than I should otherwise consider necessary. This clause of the Constitution, like those dividing the powers of the government, and declaring the attributes of each, is the declaration of a general principle, which is 'not to be regarded as a rule to fetter and control, but as matter merely declaratory and directory.' (Peter's Cond. R. 213.) It confers no specific powers, 'nor does it enjoin any specific duty.' 'This power of general supervision,' says an able commentor on American law, 'is a duty enjoined on the federal and state executives.' 'It would be dangerous, however, to treat this clause as conferring any specific power which they would not otherwise possess. It is to be regarded as a comprehensive description of the duty of the executive to watch with vigilance over all the public interests.' (Walker's Am. Law 103.) The Governor is not to execute the laws himself, but is to see them executed. This duty is performed by lending the aid and power of the executive arm to overcome resistance to the law. The history of the federal and state governments affords practical expositions of this clause of the Constitution in conformity with this construction. The executive is to see the laws executed, not as he may expound them, but as they may be expounded by those to whom that duty is intrusted. To the Legislature is delegated the authority to make the laws, to the courts the authority to expound them, and to the executive the authority to see them executed as they are thus interpreted. His interpretation is proper only when specifically required by law, or where the ordinary means are inadequate to the object of their design. But to assume the power of expounding, and also that of executing the law, would be a usurpation of the functions of the judiciary, and concentrating, in one department, powers expressly declared, by the Constitution, to belong to two separate and distinct departments.

"The manifest intention of the Constitution, and the authority cited in the absence of all precedent and principle militating against it, would seem to be conclusive against the executive claim of power, under this provision, to direct the secretary how he shall execute the duties assigned him by law; and if he has no power to direct him how he shall execute his duties, he certainly has no power to dismiss him for not conforming to his directions.

"But it is, notwithstanding, insisted that this clause of the Constitution confers the power of dismissing, not only the secretary, but all the other officers in the executive department. If it confers the power of supervision and dismissal as to one officer, it also gives the same authority over every other one in the government (except, perhaps the judges) upon whom the performance of a duty may be enjoined by law. The injunction to see the laws executed, is general, and sufficiently comprehensive to embrace every law, and every officer; and if under it the Governor may dismiss from office the secretary, auditor, treasurer, and Attorney General, which is claimed for him, I cannot see why he may not dismiss every other one, without regard to the manner of their appointment, or the tenure of office; and thus, by the construction of one clause of the Constitution, bring all the officers, and the operation of all the laws of the state, under executive control. This would counteract the whole scope and design of the Constitution, by substituting the changing and capricious will of one man for the fixed and known rules of the law.

"From this consequence I can see no escape, if the principle contended for be adopted. The argument in support of executive power limits it to the removal of the officers in the executive department; but where is the authority for the discrimination? It is not to be found in the Constitution? It confers no authority over them that can be brought in aid of this construction, but, on the contrary, it would conflict with the performance of the duties assigned them, particularly that of registering the acts of the Governor, required of the secretary. The language of the Constitution is general, and embraces all the officers, as much as part. If the executive, therefore, may say to one officer how he shall execute a law, and dismiss him if he does not obey, he may say so to another. He may not only direct the auditor what warrants he shall issue, and the treasurer what ones he shall pay, or refuse payment of, but he may direct the Attorney General and state's attorneys whom they shall prosecute, the court what judgment it shall render, and the sheriff in what manner he shall execute it. This power, in the hands of any ruler, would leave to the citizens no safety for life, liberty, or property.

"Although these consequences would, I believe, be alike deprecated by all, they are such as must flow from an exposition of this clause that would give to the executive, authority to direct how an officer should execute a law, and dismiss him from office if he did not obey the direction. It is no

answer to say that the Governor has no right to violate the law, but only to see it executed. The right to direct how a, law shall be executed presupposes the right of exposition. How else can its meaning and intention be known? To direct an officer in the performance of his duty, he must decide what that duty is. This power, includes, also, the right to decide upon the validity of the law; for if it is in violation of the Constitution, it is no law, and cannot legally be enforced. But it is useless to talk of constitutional restraints, if the executive may decide upon the law, and the duty of the officer, and enforce his decision, it must prevail, right or wrong.

"This construction of the Constitution is incompatible with the legal obligations of the officers of government, with the supremacy of the law, and with well-settled principles. It is not denied that all the duties of the secretary, and other officers, are prescribed by law; and the principle is also conceded, and relied upon, that when the law imposes upon an officer the performance of a duty, it also confers the the power necessary for its performance. Its injunctions would be nugatory and idle, if they did not imply authority to enforce them. But how could the secretary, or other officer, perform the duties enjoined, upon him by law, in the manner the law prescribes, if the Governor might interpose his authority and suggest a different mode?

"With every disposition that his directions should conform to the law, the Governor may err, unless we impute to him infallibility; and then the same liberal concession must be extended to the court, or there may be a difference of opinion between them. And which is to prevail? Will executive authority be a justification to the officer? Can he plead that in his defense when prosecuted for a violation of his official duty? Certainly he cannot. In what situation, then, does this executive authority place the officer? If he prefers his duty to executive dictation, he may be dismissed from office. If he submits to it, he incurs the penalty imposed by law for a violation of its injunctions, and may also be impeached, and dismissed from office. A construction of the Constitution involving consequences so absurd and unjust must be rejected as altogether inadmissible.

"But this question is settled by the adjudication of the highest judicial tribunal in the nation. In the case of Marbury v. Madison, Peter's Cond. R., the Supreme Court of the United States decided that where the duty of an officer is prescribed by law, he is bound to conform to the law, and not to be guided by the will of the President. In the performance of a duty prescribed by law, he acts under the authority and direction of the law, and not under that of the executive. This case was

an application to the Supreme Court for a mandamus to compel the Secretary of State to deliver a commission withheld by the direction of the President. In delivering the opinion, the court remarked, in reference to the President's authority to control the secretary in the performance of the duty which the law enjoined upon him: 'This is not a proceeding which may be varied, if the judgment of the executive shall suggest one more eligible, but is a precise course, accurately marked out by law, and to be strictly pursued. It is the duty of the Secretary of State to conform to the law, and in this he is an officer of the United States, bound to obey the laws. He acts in this respect, as has been very properly stated at the bar, under the authority of law, and not by the instructions of the President. It is a ministerial act which the law enjoins on a particular officer for a particular purpose.' * * *

"To carry out this object, two positions are assumed. First, that the power of removal is incidental to the power of appointment; and next, that the power of appointment to office, and removal therefrom, are executive functions, and as such belong to the Governor. The inquiry, then, is, how far these assumed axioms are true? and if true, how far they are applicable to the present case?

"If the principle that the right of removal is incidental to, and is to be exercised by the power that confers the office, is to be tested by the practice of the republics of America, it will be found to be untenable. I have shown that the practice of our own government is opposed to it; and by recurring to the practice of the general government, it will be seen that the practice under that is also opposed to it. I am not familiar with the practice of the state governments generally, but so far as my knowledge extends, their practice accords with that under our government. But admit it to be correct, as contended for, it would not give the Governor the right to remove the secretary from office, but would take from him all title to the exercise of this right, upon this or any other principle. The Constitution gives to the Governor and Senate, conjointly, the appointment of the secretary. To them, conjointly, then, under the rule contended for, would belong the right to remove him. But, notwithstanding the unequivocal language, and obvious intention, of the Constitution, it is insisted that the Governor alone appoints the secretary: and a decision of the Supreme Court of the United States is relied upon, in support of the position. The Constitution of the United States gives to the President, by and with the advice and consent of the Senate, the power to make treaties, and to appoint ambassadors, judges, and all other officers whose appointments are not other-

wise provided for, and which shall be established by law. But Congress may vest the appointment of inferior officers in the President alone, etc. Our Constitution gives the appointment of the secretary to the Governor and Senate, in language identical with the language of this provision in relation to appointments by the President and Senate. The question before the Supreme Court of the United States, in the case referred to, Marbury v. Madison, was not whether the President alone, or whether the President and Senate conjointly conferred appointments. The question which it did decide, was in relation to its jurisdiction; but that which was intended to be presented was, whether the President could control the Secretary of State in the performance of a duty prescribed by law; and the court said he possessed no such power. In the investigation of this point, it is said, in relation to appointments to office by the President and Senate, that the nomination is the sole and voluntary act of the President, and that the appointment is also the sole and voluntary act of the President, though it (the appointment) can only be performed by and with the advice and consent of the Senate. Does this prove that the President alone makes the appointment? Does it not rather prove that the appointment is made by the joint action and co-operation of the President and Senate? The action of the Senate is as necessary to create the appointment as that of the President. Without its vote of advice and consent, no appointment can be made. How, then, can it be contended that they have no participation in the matter? We are not to lose sight of the sense and substance of the Constitution by confining our attention exclusively to the form of expression. The whole clause and every other clause having a bearing upon the subject are to be taken together, and construed according to the plain and generally received meaning and acceptation of its language, and the obvious intention of its authors. As it is obvious, then, that the President alone, and consequently the Governor, does not confer the office, as he alone does not create the officer, he alone cannot, according to the rule laid down, remove him; as the advice and consent of the Senate is necessary to confer the office, it must, according to this rule, be necessary to remove him.

"After giving to the President and Senate the appointment of ambassadors and other superior officers, the Constitution provides that the appointment of inferior ones may be vested in the President alone. Is it not clear, then, that he alone does not appoint those just before enumerated, and declared to be appointed by the President with the advice and consent of the Senate? A construction of the Constitution which would give the President alone the appointment of judges, ambassadors, etc., would be rather an amendment than a construction of it. It would leave out a part, and a very important part, of the clause in relation to the appointment of officers. The co-operation of the Senate was intended for some purpose. The provision requiring it was not inserted in the Constitution without design. It appears, from the journal of the convention, that it was adopted as an amendment to the original drafts upon the report of a committee; and was intended to give to the Senate a participation in, and control over appointments to office. That this was the light in which this provision was viewed by the first Congress, and that it was then understood that the Senate, conjointly with the President, was the appointing power, is proved by their debates. This is also Judge Story's view of the subject. He says, 'The power to nominate does not naturally or necessarily include the power to remove; and if the power to appoint does include it, then the latter belongs conjointly to the executive and the Senate.' (3 Story on Const. 390.)

"Again he says, 'The President is to nominate, and thereby has the sole power to select, for office; but his nomination cannot confer office, unless approved by a majority of the Senate. His responsibility and theirs is thus complete and distinct.' (3 Story on Const. 376.)

"According to these authorities, and the plain and obvious meaning of the Constitution, the Senate, as a co-ordinate branch of the government, conjointly with the President, is the appointing power, under the Constitution of the United States; and as our Constitution gives the Governor and Senate the appointment of secretary, in the identical language of that of the United States, in reference to appointments by the President and Senate, it follows conclusively that the Governor and Senate conjointly appoint the secretary, and that the Governor alone cannot remove him, because he alone does not appoint him. The secretary being appointed by and with the advice and consent of the Senate, upon the principle laid down by the court below, their advice and consent is necessary to remove him.

"Whatever degree of weight, therefore, may be allowed to the maxim, that the power of removal is incidental to, and included in the power of appointment, it cannot be brought in aid of the Governor's claim of power to remove the secretary. If it has no application under our government, it can have no influence upon the present case; but if, on the other hand, it is, according to the assumption of the court below, a principle of universal application, whenever the tenure of the office of the appointee is unlimited, it will be conclusive against the Governor's power to remove the secretary; because, under this rule, the

advice and consent of the Senate is as essential to the removal as it is necessary to the appointment; and that has not been given.

"It is also contended that the Governor may remove the auditor and treasurer, etc. This position, and the position that the right of removal is incidental to that of appointment, cannot both be correct. The General Assembly appoint these officers; how, then, can the Governor remove them, if that right belongs to the power that appoints them?

"The arguments and positions in favor of the power claimed for the Governor cannot be reconciled with each other. One clear and plain grant of power is sufficient to justify its exercise; but it is certainly a presumption that no such grant can be found, when the advocates of the power rely with more confidence on general maxims, drawn from other governments, than upon the provisions of the Constitution itself. The application of one of these maxims to the present case, I have shown, would defeat rather than sustain the claim of executive power. The next political maxim relied upon is, that the right of appointment and of removal from office are executive functions, and, as such, belong to the executive. The practice of the President, under the Constitution of the United States, is also relied upon as evidence of a similar authority in the Governor, because of the supposed similarity between that Constitution and ours.

"It is assumed, as an undeniable proposition, that the power to appoint to, and remove from office are executive functions; and upon this assumption, the argument in favor of the Governor's right to remove the secretary is based. The most improbable and fanciful theory may be established, if the premises upon which the arguments in its favor are founded, may be assumed without proof. But the truth of the premises should be established before we presume to draw conclusions. The assumption that appointment to, and removal from office is an executive function, warranted by our Constitution, as a political maxim, is subject to exceptions, and is applicable only to governments which give that power to the executive. Such as deny to the executive the exercise of this prerogative are exceptions to the rule. It is rather a monarchial than a republican maxim of government; so far as I know, or as has been shown, we may search in vain, in the republics of the Union, for a constitutional grant to the executive, of the power of removal from office; while that of appointment is variously modified. In England, the power of appointment and removal belongs to the king; but that does not prove that it does or should belong to the Governor. We have adopted the common law

of that country, but not its government, or political maxims. According to the theory of that government, the king is the sovereign power. He is the fountain of all honors and offices; all are conferred by him, and may be recalled by him, at pleasure. They are the officers of the king and not of the government or people; hence the maxim, under that government, that the power of appointing and removing officers is an executive function. But as the theory and principles of our government are essentially different, it necessarily follows that the maxims and rules of government flowing from, and applicable to it are also different.

"According to the theory of our government, the people are the sovereign power. All officers are created and administered for their benefit and convenience, and not for the benefit or convenience of the chief magistrate. All the officers of government derive their authority directly or indirectly from the people; and an officer who is to execute or administer the laws is not less an officer of the people, nor more an officer of the executive, or the Legislature, because the people have declared by the Constitution that he shall receive his appointment through their instrumentality. In making the appointment, they act as the agents of the people, but when that act is performed, their agency and authority ceases. The President is appointed by electors, but that does not make him their officer, or subject to their control. So, where no other power than that of appointment is given to a department of the government, none else can be exercised, unless where the appointee is the mere agent, and bound to execute the will of the appointing power.

"If, in claiming the power of removal as an executive function, it is meant that this power belongs, ex-officio, to the Governor; that it grows out of, and belongs to, the office, the position is altogether untenable; the executive power under this, and every other constitutional government, is just such a power as the Constitution confers upon him. That is the only source of power. Neither the practice nor maxims of other governments can confer upon him any functions or powers. But it is laid down, as 'a well-settled political proposition, that, whenever the legislative powers of a government are undefined, it includes the judicial and executive attributes.' (1 Peter's Cond. R. 213.) The executive and judiciary, therefore, can exercise no powers but such as are granted, while the Legislature can exercise all powers not forbidden.

"It is also argued that the Constitution of this state was modeled after that of the United States, and that, inasmuch as the President has the power, under that instrument, of removing officers in the executive department, the same power was intended

to be given to the Governor. This reasoning is more plausible than sound, and, like that predicated upon the assumption that the secretary is the confidential officer of the Governor, and that the power of appointment and removal is an executive function under our Constitution, is based upon incorrect premises. Some of the provisions of the two constitutions are similar, but they are essentially different as regards the grants of executive power. They both contain the same general division and definition of the powers of government, and both grant to the executive the pardoning power, and constitute him commander-in-chief. They are also alike in requiring him to see that the laws are executed, and to give information, to the legislative department, of the state of the government. The right of the President to require the opinion, and of the Governor to require information from the officers in the executive department, I have shown to be different, and intended for a different purpose. And I think I have also shown that the power of removal cannot be inferred from these, or any of the provisions in which the two Constitutions are similar. The power of appointment to office, delegated to the respective executives, and the power of supervision intended to be conferred, will, by a recurrence to the Constitution, be found to be widely different. If the constitutional grants of executive power can be shown to be similar in reference to some subjects, but are different in respect to appointment to office, it must be evident that different powers were intended to be conferred. That could be the only motive for a deviation from the supposed model.

"But, is there not as much reason for supposing that the Constitutions of the state governments served as models for the formation of ours, as that of the United States? There is scarcely a provision in it that is not to be found in one or other of the state Constitutions, either identical, or in a form slightly modified; and as the objects and general powers of our government bear a nearer resemblance to those of the other state governments than to those of the general government, their practice, under constitutional provisions similar to ours, would seem to afford a precedent (so far as precedent is entitled to influence) of more weight than that of the general government. But, so far as my knowledge upon this point extends (though I confess it is limited), I do not know of but one Governor in the Union who possesses the power claimed for the Governor of this state. And we may fairly presume that none other does, as the evidence of its exercise has not been adduced by any of the able counsel, who did not omit to bring forward every practice or exercise of executive power calculated to countenance or support that which they advocated.

"In order to ascertain how far the practice of the President can be regarded as a precedent for the like practice by the Governor, it is necessary to inquire how far their constitutional powers of appointment to office are alike; and also, whether the officers whom the President may remove, and the secretary of this state, bear the same relation to the respective executives? Upon a similarity in these points, and upon both executives having the same interest in, and control over, the subjects to which the duties of the officers relate, must depend the degree of influence which the practice of the general government is entitled to have upon that of ours. The same grant of power does not necessarily or naturally give the same control over the subjects or officers of a different character.

"But, recurring to the Constitution of the United States and of this state, there will be found a great disparity between the executive powers of appointment to office conferred by the two Constitutions; and by recurring to the organization of the offices under the two governments, as great a disparity will be found to exist in relation to the control and supervision conferred upon the respective executives over the officers in the executive department; and none of the reasons upon which Congress, in 1789, recognized in the President the right to remove those officers, are applicable to the Governor's claim of power.

"By the second section of the second article of the Constitution of the United States, it is provided that the President 'shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur, and shall nominate, and by and with the advice and consent of the Senate shall appoint ambassadors, other public ministers, and consuls, judges of the Supreme Court, and all other officers of the United States whose appointments are not herein otherwise provided for, and which shall be established by law. But Congress may by law vest the appointment of such inferior officers as they may think proper in the President alone, in the courts of law, or in the heads of departments.'

"This clause gives to the President and Senate the appointment of all the superior officers of the government; and Congress has given most of the others. There is some propriety, therefore, in calling appointment to office an executive function, under the general government. But can it be so called, under ours?

"The Constitution of this state, after giving the appointment of clerks to the courts, and that of almost all the other officers to the people and the Legislature, provides, by the twenty-second section of the third article, that 'the Governor shall

nominate, and by and with the advice and consent of the Senate, appoint all officers whose appointments are not herein otherwise provided for;' with the further proviso that inspectors, etc., and all other officers whose jurisdiction is confined to the county, may be appointed in such manner as the General Assembly shall prescribe. Although the Constitution provides, I believe, for the appointment of all the officers it creates, and gives to the Legislature the right of prescribing the manner of appointing all county officers, still this section would have left to the Governor some chance of appointment to office, besides those specially given him, if this was all that had been said upon the subject. But it is not. By the tenth section of the schedule, it is declared that 'an Auditor of Public Accounts, an Attorney General, and such other officers for the state as may be necessary, may be appointed by the General Assembly, whose duties may be regulated by law.'

"The practical construction which this section has received takes from the Governor all appointments except such as are expressly given him. I do not express any opinion upon the propriety of this construction; and I am still less disposed to advocate the policy of giving all appointments to office to the Legislature, rather than to the executive. But that is not the point for adjudication.

"What officers, then, has the Constitution given the Governor the right to appoint that establishes the analogy between the constitutional powers of the President and the Governor? The President may, in conjunction with the Senate, appoint all the superior officers of the general government. The Governor may, in conjunction with the Senate, appoint a Secretary of State, and he may appoint his staff officers. These are all. How, then, can it be said that there is an analogy between the two Constitutions in reference to the power of appointment delegated to the respective executives? On the contrary, there is a marked contrast between their constitutional powers.

"And does the Governor's right to appoint two staff officers, and Secretary of State, create a general rule, and constitute appointment to office an executive function, under our Constitution? I think not. But, to prove that it does, the court below gives a long list of officers, embracing nearly all belonging to the government, who may be appointed by the people, the Legislature, or the judiciary, and says that these are all the instances in which appointments can be made, except by the executive. And these, it is contended, are exceptions to the general rule that appointment to office is an executive function. Now, to say that the appointment of three officers, and one of them in connection with another branch of government, constitutes a general rule, and that the appointment by the people, the Legislature, and the judiciary, of several hundred times that number, are merely exceptions to this general rule, is, to my mind, a confusion of language, and confounds and reverses all preconceived ideas of general rules, and the exceptions thereto.

"As the right of appointment to office has not been given to the Governor as a general rule, as it has to the President, the analogy between their powers, relied upon, does not hold good; and whatever may be the theoretical or political denomination of this power under other governments, it connot be considered an executive function, under our Constitution, because it does not belong to the executive. Under the English government, the power to declare war and to coin money, as well as to appoint to office, are executive functions, because they belong to the executive. But they cannot be so denominated, even under the general government. These powers not having been granted to the executive of that government, they cannot, under it, be called executive functions. So diversified is the practice of the governments of the states, in reference to the appointment of officers, that no general rule can be deduced from it; certainly none to justify the assumption that it is an executive function. Under these governments, then, it is an executive, or legislative, or popular function, or power, according as the respective Constitutions have made it so.

"The disparity between the powers of the President and Governor is not greater in reference to appointment to office than it is in reference to their supervision and control of the officers of the executive department, when appointed.

"The Constitution of the United States and of this state contain the same declarations, that the executive powers of the government shall be vested in the respective executives; and, in the Constitution of the first, this declaration is carried out by its other provisions. It creates no other officers in whom a portion of this power is vested, or required to be vested, by law. Those officers whom the President may remove are created by law as aids and helps to him in the performance of his duties. But the declaration in our Constitution that the executive power of the government shall be vested in the Governor is to be understood in a much more limited sense; inasmuch as, by its other provisions. it is greatly circumscribed and narrowed down. Unlike the Constitution of the United States. ours has created other executive officers, in whom a portion of this power is

required to be vested by law, not to be assigned by the Governor. He can assign no duties to the secretary. That idea is negatived by the Constitution, requiring all his duties, in addition to such as it has prescribed, to be assigned by law. He is, therefore, the officer of the Constitution, and not of the Governor.

"By an examination of the laws of Congress, organizing the officers of the executive department of the general government, and by recurring to the Constitution, it will be found that this distinction exists in reference to all the officers in the executive department of the two governments. And by a recurrence to the congressional debates of 1787, it will be seen that the power of removal was conceded to the President because of his executive powers, of his responsibility for the performance of the duties of the executive department, and of his supervision and control of the executive officers. None of these apply to the Governor. * * *

"The Governor is neither in fact nor in theory personally or politically responsible for the official conduct of the secretary, or any other officer. He cannot assign him the performance of a single duty, or control him in the performance of those assigned by law. He does not move in the executive circle, as has been said, but in that marked out by the Constitution and the law, separate, distinct from, and independent of, that of the Governor. He looks to the law for his authority and duties, and not to the Governor; and to that, and that alone, he is responsible for their performance. * * *

"The congressional exposition of the Constitutional powers of the President, in 1789, has been relied on, with much apparent confidence, as authority in favor of the Governor's claim of the same power that was conceded to the President. But, from a view of the arguments and reasons upon which the authority of the President was urged, and allowed, taken in connection with the disparity between the constitutional powers of the two executives, and the contrast between the character of the executive officers of the general and state governments, it is to my mind a strong authority against the exercise of the same power under the latter that is allowed under the former. Throughout, there is rather a contrast than analogy between the circumstances of that case and the present. The office of secretary is created by the Constitution, and all his duties are prescribed by law, agreeably to the Constitution. The President has no constitutional power to remove any officer whose office is thus created, or all of whose duties are thus prescribed. But so far as he possesses the power to remove this class of officers, it is expressly given by law. But the offices of those officers whom he may dismiss owe

their origin to the law, and not to the Constitution, and are consequently subject to repeal or modification. Their duties are, to a great extent, prescribed by the President; and to him alone, to that extent, they are accountable for their performance. The executive power and the control of the executive department of the government are vested, by the Constitution, in the President alone. It creates no other officer in whom any portion of this power is vested, or required to be vested, by law; and those who are to aid him in the performance of his duties are, by the laws of their creation, placed under his supervision and control. They bear to each other the relation of principal and agent. Hence his responsibility, and his right of removal. But mark the contrast between the constitutional delegation of power to the two executives, upon this subject. Our Constitution has not delegated to the Governor all the executive power of the government; nor has it given him any direction or control over the secretary, or other officers of the executive department.

"By the creation of these officers, the Constitution contemplated a division of the executive power of the government; and by requiring their duties to be prescribed by law, it negatived the idea of their being prescribed by the executive, as those of the general government are. The Governor, therefore, has no control or direction of the secretary, and his responsibility is as limited as his authority is circumscribed.

"From this comparison between the powers of the President and Governor, and between the character, duties, and accountability of the officers whom the President may remove, and the secretary of this state, there is no similarity, so far as regards the decision of this case; and, by an examination of the debates of 1789, it will be seen that the concession to the President of the power now claimed by the Governor was made for reasons which can not apply to it. Convenience and a supposed necessity may have had some influence, but, from the general scope and tendency of the arguments of the advocates of the President's power, there would seem to be no doubt but the concession was made because of the general grant to him of executive power; his entire control over, and responsibility for, the proper administration of the executive departments; and because of his right to prescribe the duties of the officers of the departments, and supervise and control them in the manner of their execution. The same principle upon which the President's power was affirmed, was carried out and applied to the functionaries of the government by the legislation of this Congress. In organizing the judicial courts, they gave to the Presi-

dent and Senate the appointment of marshals, and to the marshals the appointment of their deputies; but, because of the interest in and control over the subjects to which the deputies' duties relate that the court must necessarily have, the right to dismiss him from office was given to the court, and not to the marshal, by whom he was appointed.

"The marked disparity between the powers and responsibility of the general government and that of this state naturally and necessarily results from the different character of the respective governments, their powers, duties, and the object of their creation.

"The government of the United States is the national government of the Union. To that is delegated the attributes of national sovereignty. The duties of the executive of the national government are, therefore, widely extended and greatly diversified; 'embracing all the ordinary and extraordinary arrangements of peace and war, of diplomacy and navigation, of finance, of naval and military operations, and of the execution of the laws throughout almost infinite ramifications of details, and in places at vast distances from each other.' His views are not bounded even by the circuit of the whole Union, but must extend to the most remote regions to which commerce or navigation has extended, or connected our interest. So multifarious and diversified, therefore, are the functions of his office that the limited abilities of no one man are equal to their discharge. Hence the necessity of organizing various departments, and the employment of numerous ambassadors, and other public ministers; all of whom constitute so many aids and helps in the performance of the executive duties of the President. And as many of the duties of these officers cannot be regulated by law, because they cannot be anticipated, but arise out of the changing exigencies of time and circumstances, large discretion must, from necessity, be vested somewhere; and it has been vested in the President as the chief executive officer of the government. From his interest in and control over all the business of the executive department, and his political responsibility for its administration, arises his right to supervise, control, and dismiss those executive officers who are his political and confidential aids in the discharge of his executive duties. But the state governments are widely different in their objects, powers, and duties. Compared with the general government, they may be denominated domestic governments. They act exclusively upon the domestic relations of life. Their regulations and sphere of action are limited to their territorial boundaries. The powers and duties of the chief executive magistrate, therefore, are

proportionately limited, and such as from their nature are capable of being specifically prescribed and regulated by law; and, unlike those of the President, they may all be performed in person. He neither has, nor does he require, the aid of others in the performance of any of his duties. The duties, likewise, of all the executive officers of the state are capable of being regulated by law; and by our Constitution, they are required to be so regulated. No discretionary authority or control over them is delegated to the Governor by the Constitution; nor does it contemplate the delegation of such power, by law.

"From the discretionary powers with which the President is clothed, there is a necessity for his possessing the power of removal, which does not exist in the case of the Governor. The heads of departments and public ministers being the political and confidential officers of the President, to execute his will, and act in cases in which he possesses a legal discretion, all their acts in this character are only politically examinable. The duties which are not enjoined by law cannot be enforced by its process. But as the law has expressly given to the President the right to prescribe the duties of those officers, it also gives, by necessary implication, the power of removal, as a means of rendering available the authority expressly granted.

"But this reason does not exist in favor of the like authority in the Governor. The rule is that the duties of an officer that are enjoined by law may be enforced by the mandates of the law; and as all the duties of the secretary, and other executive officers of this state, are thus enjoined, they can be enforced by the process of the law. No authority being given to the Governor to assign any of these duties, no right of removal can be implied to enforce a command which he has no right to give. This is the doctrine of the Supreme Court of the United States, in the case of Marbury v. Madison, although the Secretary of State of the United States is the political and confidential officer of the President, so far as he may prescribe the duties of that officer; but in the performance of duties which the law has enjoined, the court said, the secretary acted as the officer of the law, and not of the President. In such a case, the law, and not the will of the President, was to be his guide, and the rule to which he was to conform. Any other doctrine would place the executive above the law, and make his will, in place of the law, the rule to which its officers are amenable for the proper discharge of their duties. This would be in violation of the whole tenor and spirit of the Constitution, which regards the law as paramount to all other authority, and as constituting the rule to which all are bound to conform, and to

which all are amenable, officially and individually. In every aspect, then, in which I can view this case, I am constrained, according to the convictions of my mind, to say that the Governor has no power, under the Constitution, to remove from office the Secretary of State, at will and pleasure. No express grant of this power is to be found in the Constitution; nor can it be implied from any of its provisions. It is not a power necessary, as has been shown, to the exercise of any of the powers expressly delegated, or the performance of any of the duties enjoined upon the executive. It must, also, be manifest that he alone can have no title to the exercise of this power as being incidental to that of appointment, inasmuch as he alone does not confer the appointment. In the performance of that act, the co-operation of a co-ordinate and independent branch of the government is essential. Upon the principle, therefore, that the authority that confers an office may remove the officer, the advice and consent of the Senate is as necessary to the removal of the secretary as it is to his appointment. It has also been shown that the practice of the President can be no precedent for the like practice of the Governor, because of the disparity between the constitutional powers conferred upon the respective executives, particularly in reference to the power of appointment to office; and also in reference to their authority over the officers of government, as contemplated by the respective Constitutions, and as delegated by law.

"The doctrine that the power of removal from office at will must necessarily be lodged in some department of every government, is abundantly refuted by the practice and experience of our own government for upwards of twenty years; and likewise by other state governments of the Union for half a century; in none of which has the want of the power been complained of as an evil, or even a defect. But, although this court cannot be governed by considerations of expediency, yet I do believe that the conclusion to which I have arrived, by the application of the legal rules of interpretation, is in accordance, not only with the language and spirit of the Constitution, but with sound policy, and the best interests of community.

"According to my construction of the Constitution, the power of removing from office the secretary, auditor, and Attorney General is lodged in the hands of the representatives of the people. They may not only give these officers whatever tenure they please, but they may, by law, confer upon the executive the power of removal, under such regulations as the interest of the public may require. By those who hold the opposite doctrine, it is contended that the power of removal belongs, unconditionally, to the Governor, not by any specific grant of the Constitution, but by construction. The question, then, so far as power is concerned, is one between the executive and the legislative departments of the government. Which of these departments can be most safely trusted with, or would be most likely to abuse, this trust? The lessons of political experience answer that power is much safer when operating and regulated by a law made by the representatives of the people than when its exercise depends upon the uncontrolled and arbitrary will of one individual, however exalted may be his station."

The decision of that court has been cited with approval and followed in many instances. I find no authority to the contrary. That decision is the basis of the statement cited in the opinion of this court from Cooley on Constitutional Law, and the principle therein announced is the basis of the text in a text-book for colleges and universities, entitled Introduction to American Government (the Century Co., 4th Edition) 1931, by Frederick A. Ogg, Professor of Political Science, University of Wisconsin, and P. Orman Ray, Professor of Political Science, University of California (page 757), as follows:

"Although commonly charged with the duty of seeing that the laws are faithfully enforced, the Governor enjoys little or no inherent authority derived from the mere fact that he is the chief executive of the state. His position in relation to the state administration is therefore distinctly inferior to that of the President in relation to the national administration. The federal Constitution broadly bestows 'the executive power' of the United States upon the President; but no corresponding clause in state Constitutions concentrates executive power in the Governor, giving him an indefinite sphere of executive influence. On the contrary, the executive authority in state government is shared by a number of officers. State Constitutions frequently say expressly that the executive branch of the government shall consist of the Governor, Lieutenant Governor, and various other officers mentioned by title; and that merely the 'supreme' (or chief) executive power belongs to the Governor. Such provisions, combined with the tendency of the courts to construe grants of power in state Constitutions rather narrowly, have left the Governor with practically no executive authority which is not clearly granted by some definite provision in the Constitution or by some statute."

Since the rule has been followed from the year 1839 to this date, I see no reason why it should not be applied in the present case. It is particularly applicable under the facts shown by the record in this case. for, under

the Constitution of this state, the executive authority of the state is not vested in a Governor, but in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance, and other officers provided by law and the Constitution. Section 1, article 6, of the Constitution.

It is said that, by the provisions of section 4, article 6, of the Constitution, the term of office of state officers is fixed at four years. Such is not the case. By the provisions of that section, the term of office of the Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, State Examiner and Inspector, and Superintendent of Public Instruction is fixed at four years, but the term of office of the other officers named in section 1, article 6, supra, is not fixed by the provisions of section 4, article 6, supra, and there is no constitutional provision fixing the term of office of officers which the Legislature is authorized to create by law under the authority of section 1, article 6, supra.

It is said that to permit the Legislature to fix the term of office of the State Highway Commissioners at more than four years would authorize it to fix that term at a much longer period of years. It would be difficult to have such legislation adopted over the veto of the Governor and, in the event it was adopted and it was not satisfactory to the people, the people could exercise their right of referendum. I know of no constitutional provision limiting the power of the Legislature to fix the term of office of the members of the State Highway Commission, which it was required by the provisions of the Constitution to establish. None has been cited. Both the legislative and the executive branches of the government have followed a different policy. Among the examples thereof is the Board of Dental Examiners, the term of the members of which is five years by the provisions of section 4371, O. S. 1931; the Forest Commission, the term of the members of which is fixed at six years by the provisions of section 4752, O. S. 1931; the Library Commission, the term of the members of which is fixed at six years by the provisions of section 4918, O. S. 1931; the State Board of Agriculture, the term of the members of which is fixed at five years by the provisions of section 8525,

O. S. 1931; the Board of Regents, the term of the members of which is fixed at seven years by the provisions of section 7209, O. S. 1931; and the State Industrial Commission, the term of the members of which is fixed at six years by the provisions of Senate Bill No. 123, chapter 72, S. L. 1931. It will be noted that Senate Bill No. 123, supra, as well as Senate Bill No. 103, chapter 66. S. L. 1931, providing that the term of office of the members of the excise board shall extend beyond the term of office of the Governor, bear the approval of the Governor of Oklahoma.

In view of that legislative and executive construction, I cannot agree with the contention that the spirit of the Constitution is against the creation of offices the terms of the officers of which extend beyond the term of office of the Governor. I find nothing in the Constitution to justify that conclusion. While the term of office of some of the state officers is fixed at four years, the term of office of the members of this court is fixed by the Constitution at six years. While that provision is applicable to judicial officers, a similar provision is applicable to members of the Corporation Commission whose term of office is fixed by the Constitution at six years. When the Legislature, acting under its constitutional authority, established a Criminal Court of Appeals, it fixed the term of office of the members of that court at six years. No one has ever questioned the legislative authority so to do.

The Constitution required the Legislature to establish a department of highways. It imposed no limitation upon the Legislature as to the method of appointment, the term of office of the members, or the manner of removal. The Legislature has exercised that authority. The fact that the President of the United States may remove an officer appointed by him, who at all times is subservient to him and who merely assists him in the performance of his duties, in nowise indicates that the Governor of the state may remove an officer authorized by the Constitution merely because the Legislature sees fit to put the appointive power in the Governor, for the Legislature could as well have provided for the election of the members of the State Highway Commission. They are in nowise subservient to the Governor. They do not assist him in the performance of his duties. Their duties are prescribed by law. They are as independent of him and his control as are the other executive officers of the state of Oklahoma. The Governor has no more power to remove them than he has the

power to remove the Secretary of State. His attempted exercise of a power which he does not have was without authority of law.

For the reasons stated, I concur in the opinion of my associates herein.

---

McNEILL, J. (specially concurring). The petition of the plaintiff, Maude O. Thomas, alleges that plaintiff is the duly appointed, qualified, acting commissioner and member of the State Highway Commission of the state of Oklahoma under and by virtue of the laws of the state of Oklahoma; that plaintiff is in possession of said office and exercising its duties and functions in the manner provided by law; that the defendant, Lew H. Wentz, has been and now is unlawfully claiming the right and title to the office now in possession of the plaintiff and has threatened to and will, unless enjoined by the court, interfere with and obstruct the plaintiff, etc.

The defendant denies these allegations, but admits that he has been and is now claiming the right and title to the office of a member of the State Highway Commission, and expressly denies that he is claiming the same unlawfully, and sets forth the grounds of his title to the office by virtue of his appointment, pursuant to the Act of the Legislature of the state of Oklahoma approved April 1, 1929, wherein he was appointed by the Governor of the state of Oklahoma and by and with the advice and consent of the Senate, and that he qualified as such member of the Highway Commission, entered into possession of the office, exercising the functions and discharging the duties and receiving the emoluments thereof without being molested or hindered on the part of any one until the issuance and filing of the executive order of removal purporting to summarily remove said defendant from said office as a member of the State Highway Commission; that said executive order of removal is wholly void and without any force and effect. The defendant in his prayer states that the plaintiff is not entitled to any relief in the premises, but that said defendant is entitled to cross-relief against the plaintiff enjoining her, during the pendency of the action or any action to determine the title to the office or in any wise interfering with the defendant in the exercise of the functions of his office.

In his answer, seeking cross-relief by way of counterclaim, the defendant states that he is the duly appointed commissioner and qualified member of the State Highway Commission for the term expiring April 1, 1935, and is legally entitled to occupy such office, exercise the functions, discharge the duties and receive the emoluments therefrom, and that said plaintiff, on or about the 1st day of April, 1932, unlawfully usurped and intruded into the said office of member of the State Highway Commission for the term for which this defendant was appointed as commissioner and has ever since unlawfully attempted to exercise the same and exclude this defendant and cross-petitioner therefrom and enjoy the emoluments thereof to which he is entitled. In his prayer, defendant demands judgment that the said plaintiff be adjudged guilty of usurping, intruding into, and unlawfully holding said office and that she be excluded from the same and the privileges thereof and that said defendant and cross-petitioner be adjudged to be legally entitled to have, hold, and exercise the duties of said office by virtue of the appointment thereof, and for such other and further relief, general or special, to which he may be entitled.

There was filed in said cause an instrument entitled "Agreed Statement of Facts"; in part, this instrument states as follows:

"Plaintiff, Maude O. Thomas, by her counsel of record and, defendant and cross-plaintiff, Lew H. Wentz, by his counsel of record, waive trial by jury and agree to submit the application for temporary injunction and **this case for trial on the facts and on the pleadings on this agreed statement of facts, to wit.**"

In spite of the various pleadings which have been filed, it is apparent that counsel agreed to submit the application for temporary injunction and the case for trial on the facts and on the pleadings on the agreed statement of facts for the purpose of considering the cause on its merits. If the court determined the sufficiency of the pleadings alone, there would be no occasion for considering the agreed statement of facts. Counsel did not limit themselves to this proposition, but agreed that the cause be submitted for trial on the facts and on the pleadings on the agreed statement of facts. The case of Bynum v. Strain, 95 Okla. 45, 218 P. 883, controls the procedure and the determination of the issues presented herein. The agreed statement of facts constitute a part of the judgment roll and it is immaterial in this case what the pleadings were called. The facts were completely set forth in the judgment roll. It is difficult to consider this record as framed by the pleadings

and the agreed statement of facts and discountenance the theory that the title to the office is not involved. There could be no possession of the office without color of title.

The plaintiff states that she is a duly appointed, qualified, and acting commissioner under and by virtue of the laws of the state of Oklahoma and in possession of said office and the defendant has been and now is unlawfully claiming the right and title to the office occupied by and now in the possession of plaintiff. Multiplicity of suits are not favored in law. Both parties, plaintiff and defendant, were claiming title to this office of Highway Commissioner, the plaintiff by her appointment through the executive order of the Governor, the defendant by his appointment and confirmation thereto by a former Governor pursuant to an Act of the Legislature of the state of Oklahoma, approved April 1, 1929. The trial court should have determined this question. The counterclaim and the agreed statement of facts were before the court for its consideration in determining the issues framed. The record is conclusive, in view of the agreed statement of facts, that the defendant elected to stand on his counterclaim. See 20 C. J. 19-32; Okmulgee Producing & Refining Co. v. Davis, 99 Okla. 4, 225 P. 550. The counterclaim was germane to the plaintiff's cause of action. The demurrer should have been overruled. Both the petition and counterclaim involved the title and possession to the office. The right to possession of said office and the title thereto follow as an incident to each other. There could be no possession without the right to possession, and the right to possession must of necessity be based upon authority and title to the office. The person in possession of such office without title has no authority or right to such possession. The agreed statement of facts presents questions of law. With the pleadings and the facts before this court, it is the duty of the court to render such judgment as the trial court should have rendered.

The pleadings and agreed stipulation of facts present the question as to whether the Governor by executive order can remove defendant as a member of the State Highway Commission whose tenure of office is for a definite period. In other words, is this part of the legislative enactment in question constitutional? If it is constitutional, the removal by executive order must fail. The Legislature in its wisdom saw fit to enact as a law that the office in question should be created whereby the incumbent thereof should be appointed by the Governor by and with the advice and consent of the Senate for a definite and fixed term. This act made no provision that the removal of the member of the Highway Commission so appointed should be by the Governor of the state. Did the Legislature have power to enact such a law? If it did, it is a valid and binding law. Sovereignty exists with the Legislature. Laws and offices are enacted and are created for the benefit and convenience of the people.

Judge Cooley, in his admirable work on Constitutional Limitations, states:

"There is a broad difference between the Constitution of the United States and the Constitutions of the states as regards the powers which may be exercised under them. The government of the United States is one of enumerated powers; the governments of the states are possessed of all the general powers of legislation. * * * We look in the National Constitution to see if the grant of specified powers is broad enough to embrace it; but when a state law is attacked on the same ground, it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the state, we are able to discover that it is prohibited. * * * We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Congress can pass no laws but such as the Constitution authorizes either expressly or by clear implication; while the state Legislature has jurisdiction of all subjects on which its legislation is not prohibited."

The Supreme Court of Indiana, in the case of Overshiner v. State, 156 Ind. 187, 83 Am. St. Rep. 187, said:

"The power of the General Assembly to enact laws is subject to no restrictions save those imposed by the state and federal Constitutions."

In fact, there is no limitation upon the legislative enactments so long as they are not in conflict with the federal Constitution and inhibited by the state Constitution. Even the executive or judicial branch of government can exercise no power but such as are granted, while the legislative branch of government can exercise all power except those which are not forbidden. See 1 Peter's Cond. R. 213; Field v. People, 3 Ill. 111; People v. Morgan, 90 Ill. 558. In other words, if there are no inhibition and no restrictions upon the legislative enactment, it must be held valid and enforceable when

enacted. Hovey v. State, 119 Ind. 395, 21 N. E. 21.

In reference to the power of removal as being an incident to the power of appointment, a different rule prevails where the office is for a fixed term. This is set forth in the case of Bynum v. Strain, which quoted from 12 C. J. 899, as follows:

"The power to remove from office is not under our system of government to be implied as a part of the inherent power of the Governor or other executive officer. Such power of removal may or may not be vested by the Constitution in the executive. And in the case of officers created by the Legislature the power of removal may be vested by statute in the Governor, or in some other officers or department of the government. But in the absence of such provision the power of removal is not to be exercised by the Governor."

29 Cyc. 1371, is as follows:

"Furthermore it is the universal rule that where the duration of an office is not prescribed by law, the power to remove is an incident of the power to appoint."

22 R. C. L. 562, is as follows:

"When the term or tenure of a public officer is not fixed by law, the general rule is that the power of removal is incident to the power to appoint. Tenure not having been declared by law, the office is held during the pleasure of the authority making the appointment; hence, in the absence of all constitutional or statutory provisions as to the removal of public officers, the power of removal is considered as an incident to the power of appointment. * * * But the power of removal is not incident to the power of appointment where the extent of the term of office is fixed by statute."

If the Legislature had the power to fix by law the tenure of the office in question, it is apparent that the Governor has not the inherent power of removal as an incident to the power to appoint.

The Supreme Court of South Carolina in the case of State ex rel. Lyons v. Rhame, 75 S. E. 881, Ann. Cas. 1914B, p. 519, held that this power exists only when conferred by the Constitution or statutes, or is implied from the conferring of the power of appointment; that the power of removal from office is not incident to the power of appointment where the term of office is fixed by statute and no power of removal is conferred upon the appointing power. In the note on page 524, the annotator states, as follows:

"The right of the appointing power, as an incident of the power of appointment, to remove an officer whose term of office is fixed and for whose displacement no provision is made by statute, has been specifically denied in the following cases; Bruce v. Matlock, 86 Ark. 555, 111 S. W. 990; People v. Jewett, 6 Cal. 291; Page v. Hardin, 8 B. Mon. (Ky.) 648, 672; Hager v. Lucas, 120 Ky. 307, 86 S. W. 552; Speed v. Detroit, 97 Mich. 198, 56 N. W. 570; Territory v. Ashenfelter, 4 N. M. 85, 12 P. 879; Mosher v. Stowell, 9 Abb. N. Cas. (N. Y.) 456; Hardy v. Reamer, 84 S. C. 487, 66 S. E. 678; Collins v. Tracy, 36 Tex. 546. See, also, People v. Adams, 31 Colo. 476, 73 P. 866; Speed v. Detroit, 98 Mich. 360, 57 N. W. 406, 39 Am. St. Rep. 555, 22 L. R. A. 842; Atty-Gen. v. Corliss, 98 Mich. 372, 57 N. W. 410; Com. v. Sutherland, 3 Serg. & R. (Pa.) 145; Sanders v. Belue, 78 S. C. 171, 58 S. E. 762."

In the case of Collins v. Tracy, supra, the Supreme Court of Texas held that the county treasurer, once appointed in the mode prescribed by law, had a vested right to his office, and could not be removed except for cause amounting to forfeiture of his office. The court in that case said:

"The principle that the power of removal is incident to the power of appointment, is applicable only in those cases where the office is held at the pleasure of the appointing power, and the tenure not fixed by law as in this case. * * * There being no law of this state specially authorized the Governor to remove a county treasurer from office, it follows that he can only be removed on conviction by a jury, after indictment for malfeasance, nonfeasance, or misfeasance in office."

The Arkansas cases, supra (Bruce v. Matlock), decided by that court in the year 1908, wherein it was provided that the Governor should appoint biennially a Board of Trustees of Charitable Institutions for a period of two years, that the power to remove such state officers appointed for a fixed term of office does not inhere in the Governor by reason of his having the power to appoint him. The court says:

"The members of the board having been appointed for a fixed term, and as the statute does not confer upon the Governor the power of removal, the power does not exist. The right to remove public officers does not inhere in the Chief Executive of the state. Throop on Pub. Off. sec. 362; State v. Pritchard, 36 N. J. L. 101. Under our system of government the executive enjoys no prerogative in the sense in which that word is usually employed, but he exercises only such powers as are conferred upon him by the Constitution and statutes of the state. These do not authorize him to remove members of the board of public charities. The Governor has nothing to do with the management and control of the charitable institutions of the state, further than to appoint the members of the board biennially."

In this case the Legislature had the right to create by law the office in question. It had the right to designate how this office should be filled. It had the power to designate the term of the office and the manner and mode of removal as provided by the act. They did not see fit nor deem it expedient that this removal should be placed in the executive branch of government, nor be exercised by the Governor. The power of the State Legislature is presumed in all matters, except in so far as it may be restricted by Constitution. Commonwealth ex rel. v. Benn (Pa.) 131 Atl. 253.

It is my opinion that there is nothing in the legislative enactment in question which is invalid. The provisions made by the act in question may be indicative of usurpative and aggressive legislation. It may be unwise legislation, but we are not concerned with the wisdom of the legislative enactment. That is a question for the determination of the sovereignty. It is the duty of this court to resolve every doubt in favor of the validity of legislation, and so long as there is no conflict with the state or federal Constitution, it is the duty of the court to interpret legislative acts to be valid enactments of the sovereignty.

In the case at bar, the title of the office of the plaintiff is based wholly upon executive appointment and the exercise of the power of the Governor in issuing the same. The act in question is not unconstitutional. The term or tenure of the office is fixed by law and the defendant. after he had been duly appointed and qualified, had a vested right in the office and could not be removed therefrom except as provided by law. See Lease v. Freeborn (Kan.) 35 P. 817; Jacques v. Litt'e (Kan.) 33 P. 106. There could be no removal in the instant case except in a legal manner. The executive order was void. No vacancy existing in the office, the Governor had no authority to appoint the plaintiff. See People ex rel. Parish v. Adams, 31 Colo. 476, 73 P. 866.

After a careful review of the authorities cited in the briefs of counsel, and an independent study of the legal questions involved. it is my opinion that the legislative enactment in question is not void, and that it was the duty of the trial court to determine the questions and issues raised by the judgment roll now before us.

The judgment of the trial court should be reversed and the defendant be decreed the title to the office in question and the right to the possession thereof.

---

CLARK, V. C. J. (dissenting). The fundamental principle of government involved in the case is far-reaching. Our form of government depends upon the basic charter —the Constitution of Oklahoma.

Section 1, of article 2 of the Constitution of Oklahoma provides:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare; and they have the right to alter or reform the same whenever the public good may require it; provided, such change be not repugnant to the Constitution of the United States."

So it can be seen as a golden thread in our Constitution that government should not be and never can be, under this Constitution, put beyond the control of the citizenship of this state expressed by them at the polls.

Section 1 of article 6 of the Constitution of Oklahoma provides that

"The executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance, and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law."

Section 2 of article 6 of the Constitution of Oklahoma provides:

"The supreme executive power shall be vested in a Chief Magistrate, who shall be styled 'The Governor of the State of Oklahoma'."

So it can be seen that the supreme executive power is vested in the Governor of Oklahoma. That means that all executive power not delegated by the Constitution to lesser executives is vested in the chief executive, the Governor of Oklahoma. The word "supreme" has a well-defined and well-known meaning; meaning all executive power not delegated to lesser executives is vested in the Governor of Oklahoma. There is no executive power vested in the Legislature.

Section 1 of article 4 of the Constitution of Oklahoma provides:

"The powers of the government of the state of Oklahoma shall be divided into three separate departments: The legislative, executive and judicial; and except as provided in this Constitution, the legislative, executive, and judicial departments of govern-

ment shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."

This division of authority is necessary because it has been said, and it is true, where the executive, legislative, and judicial authority is vested in one department of government, that it results in tyranny regardless of the form of government—whether monarchy, republican, or democratic form of government. So, with the division of authority under this section of the Constitution, the Legislature cannot perform the duties of the executive department; neither have they a right to restrict or control or merge with the legislative authority the executive authority.

Section 36 of article 5 of the Constitution of Oklahoma provides in part:

"The authority of the Legislature shall extend to all rightful subjects of legislation. * * *"

But where the subject of legislation attempts, as in the instant case, to control or limit the authority of the chief executive, then it is contrary and in violation of section 1 of article 4 of the Constitution of Oklahoma.

It is true, as contended, that there is a fundamental difference between the Constitution of the United States and the Constitution of Oklahoma in that the Constitution of the United States is a grant of authority and the Constitution of Oklahoma is a limitation on the authority of the different departments of government; but there is no fundamental difference between the Constitution of the United States and the Constitution of the state of Oklahoma in the division of authority of the legislative, executive and judicial departments. Under the Constitution of the United States, the legislative, executive and judicial departments are kept separate and distinct. Under the Constitution of Oklahoma, the legislative, executive, and judicial departments should be kept separate and distinct.

The majority opinion says that the case of Myers v. United States, 272 U. S. 52, 71 L. Ed. 160, does not apply, and is not binding on this court. I say that it does apply, and should be binding on this court. The able opinion of the court in the Myers Case by Mr. Chief Justice Taft is unanswerable. Congress passed a law that, by and with the consent of the Senate, certain classes of postmasters could be appointed by the President, and could only be removed by and with

the consent of the Senate. President Wilson removed a postmaster by the name of Myers. This case reached the Supreme Court of the United States, and the question of the authority of the President to remove was sustained by the Supreme Court of the United States on the theory that the chief executive of the United States, to whom the appointing power was given by the Act of Congress, had authority to remove his appointee in the executive department of government.

It is admitted here that the Highway Commission of Oklahoma is in the executive department of government. The Legislature created the position of Highway Commissioner; delegated the authority to the Governor to appoint the Highway Commissioners, but provided that the Highway Commissioners may be removed from office only by any court of competent jurisdiction for causes stated in the act. Chapter 68 Sess. Law 1929 [O. S. 1931, secs. 10072-10073].

Section 8 of article 6 of the Constitution of Oklahoma provides as follows:

"The Governor shall cause the laws of the state to be faithfully executed, and shall conduct in person or in such manner as may be prescribed by law, all intercourse and business of the state with other states and with the United States, and he shall be a conservator of the peace throughout the state."

So it can be seen that the Constitution of Oklahoma vests in the Governor of Oklahoma the duty to cause all the laws of the state to be faithfully executed, and that he shall conduct in person or in such manner as may be provided by law all intercourse and business of the state with other states and with the United States. The duty enjoined upon the Governor to see that all the laws are enforced by the Constitution of Oklahoma cannot be delegated by the Legislature to an inferior executive officer, or that he shall conduct in person all intercourse and business of the state with other states and with the United States.

There is no means provided by law by which the Highway Department may conduct the business of the Highway Department with the United States. There is only one representative of the state of Oklahoma that can conduct the business of the Highway Department with the United States and that is the Governor of the state of Oklahoma. This authority and power cannot be taken from him by the Legislature.

The acts of Congress providing federal aid for road building in Oklahoma, and the con-

duct of the business of the Highway Department with the government of the United States is placed in the Governor of Oklahoma, and any attempt on the part of the Legislature to create a Highway Department to take over these duties and conduct with the United States government the business of the state of Oklahoma is in violation of this section of the Constitution.

The Supreme Court of the United States in the case of Myers v. U. S., supra, in an exhaustive opinion reviewing the history of our form of government and constitutional authority vested in the executive department of government by the Constitution of the United States, quoted as follows:

"Mr. Madison and his associates pointed out with great force the unreasonable character of the view that the convention intended, without express provision, to give to Congress or the Senate, in case of political or other differences, the means of thwarting the executive in the exercise of his great powers and in the bearing of his great responsibility by fastening upon him, as subordinate executive officers, men who by their inefficient service under him, by their lack of loyalty to the service, or by their different views of policy, might make his taking care that the laws be faithfully executed most difficult or impossible.

"As Mr. Madison said in the debate in the First Congress. 'Vest this power in the Senate jointly with the President, and you abolish at once that great principle of unity and responsibility in the executive department, which was intended for the security of liberty and the public good. If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest will depend, as they ought, on the President, and the President on the community.' I Annals of Congress, 499.

"Mr. Boudinot of New Jersey said upon the same point: 'The supreme executive officer against his assistant; and the Senate are to sit as judges to determine whether sufficient cause of removal exists. Does not this set the Senate over the head of the President? But suppose they shall decide in favor of the officer, what a situation is the President then in, surrounded by officers with whom, by his situation, he is compelled to act, but in whom he can have no confidence, reversing the privilege given him by the Constitution, to prevent his having officers imposed upon him who do not meet his approbation? " 1 Annals of Congress, 468.

"Mr. Sedgwick of Massachusetts asked the question: 'Shall a man under these circumstances be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties? Shall he be continued, I ask again, against the will of the President? If he is, where is the responsibility? Are you to look for it in the President, who has no control over the officer, no power to remove him if he acts unfeelingly or unfaithfully? Without you make him responsible, you weaken and destroy the strength and beauty of your system.' 1 Annals of Congress, 522.

"Made responsible under the Constitution for the effective enforcement of the law, the President needs as an indispensable aid to meet it the disciplinary influence upon those who act under him of a reserve power of removal. But it is contended that executive officers appointed by the President with the consent of the Senate are bound by the statutory law, and are not his servants to do his will, and that his obligation to care for the faithful execution of the laws does not authorize him to treat them as such. The degree of guidance in the discharge of their duties that the President may exercise over executive officers varies with the character of their service as prescribed in the law under which they act. The highest and most important duties which his subordinates perform are those in which they act for him. In such cases they are exercising not their own but his discretion. This field is a very large one. It is sometimes described as political. Kendall v. United States, 12 Pet. 524, at page 610, 9 L. Ed. 1181. Each head of a department is and must be the President's alter ego in the matters of that department where the President is required by law to exercise authority.

"The extent of the political responsibility thrust upon the President is brought out by Mr. Justice Miller, speaking for the court in Cunningham v. Neagle, 135 U. S. 1, at page 63, 10 S. Ct. 658, 668 (34 L. Ed. 55):

" 'The Constitution, section 3, article 2, declares that the President "shall take care that the laws be faithfully executed," and he is provided with the means of fulfilling this obligation by his authority to commission all the officers of the United States, and by and with the advice and consent of the Senate to appoint the most important of them and to fill vacancies. He is declared to be commander-in-chief of the Army and Navy of the United States. The duties which are thus imposed upon him he is further enabled to perform by the recognition in the Constitution, and the creation by acts of Congress, of executive departments, which have varied in number from four or five to seven or eight, the heads of which are familiarly called Cabinet Ministers. These aid him in the performance of the great duties of his office, and represent him

in a thousand acts to which it can hardly be supposed his personal attention is called, and thus he is enabled to fullfill the duty of his great department, expressed in the phrase that "he shall take care that the laws be faithfully executed".'

"He instances executive dealings with foreign governments, as in the case of Martin Koszta, and he might have added the Jonathan Robins Case as argued by John Marshall in Congress, 5 Wheat, Appendix 1, and approved by this court in Fong Yue Ting v. United States, 149 U. S. 698, 714, 13 S. Ct. 1016, 37 L. Ed. 905. He notes the President's duty as to the protection of the mails, as to which the case of In re Debs, 158 U. S. 564, 582, 584, 15 S. Ct. 900, 39 L. Ed. 1092, affords an illustration.

"He instances executive obligation in protection of the public domain, as in United States v. San Jacinto Tin Co., 125 U. S. 273, 8 S. Ct. 850, 31 L. Ed. 747, and United States v. Hughes, 11 How. 552, 13 L. Ed. 809. The possible extent of the field of the President's political executive power may be judged by the fact that the quasi civil governments of Cuba, Porto Rico, and the Philippines, in the silence of Congress, had to be carried on for several years solely under his direction as commander-in-chief.

"In all such cases the discretion to be exercised is that of the President in determining the national public interest and in directing the action to be taken by his executive subordinates to protect it. In this field his cabinet officers must do his will. He must place in each member of his official family, and his chief executive subordinates, implicit faith. The moment that he loses confidence in the intelligence, ability, judgment, or loyalty of any one of them, he must have the power to remove him without delay. To require him to file charges and submit them to the consideration of the Senate might make impossible that unity and coordination in executive administration essential to effective action.

"The duties of the heads of departments and bureaus in which the discretion of the President is exercised and which we have described are the most important in the whole field of executive action of the government.

"There is nothing in the Constitution which permits a distinction between the removal of the head of a department or a bureau, when he discharges a political duty of the President or exercises his discretion, and the removal of executive officers engaged in the discharge of their other normal duties. The imperative reasons requiring an unrestricted power to remove the most important of his subordinates in their most important duties must therefore control the interpretation of the Constitution as to all appointed by him.

"But this is not to say that there are not strong reasons why the President should have a like power to remove his appointees charged with other duties than those above described. The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him or the executive power, and he may properly supervise and guide their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which article 2 of the Constitution evidently contemplated in vesting general executive power in the President alone."

In the absence of any specific provision to the contrary in the Constitution of Oklahoma, the power of appointment of executive officers whose duties are to assist the chief executive, the power of appointment to such executive office carries with it, as a necessary incident, the power of removal. The Legislature cannot create an executive office to perform the duties of the chief executive of the state of Oklahoma and make him independent of the chief executive in that he can perform the duties vested in the chief executive by the Constitution of Oklahoma independent of the chief executive.

The attitude of the Presidents on this subject has been unchanged and uniform to the present day whenever an issue has clearly been raised. In a message withholding his approval of an act which he thought infringed upon the executive power of removal, President Wilson said:

"It has, I think, always been the accepted construction of the Constitution that the power to appoint officers of this kind carries with it, as an incident, the power to remove. I am convinced that the Congress is without constitutional power to limit the appointing power and its incident, the power of removal, derived from the Constitution." 59 Congressional Record (June 4, 1920) 8609.

And President Coolidge, in a message to Congress, in response to a resolution of the Senate that it was the sense of that body that the President should immediately request the resignation of the then Secretary of the Navy, replied:

"No official recognition can be given to the passage of the Senate resolution relative to their opinion concerning members of the Cabinet or other officers under executive control. * * *

"The dismissal of an officer of the government, such as is involved in this case, other than by impeachment, is exclusively an executive function. I regard this as a

vital principle of our government." 65 Congressional Record (Feb. 13, 1924) 2335.

In the case of Bynum v. Strain, Bank Com'r, 95 Okla. 45, 218 P. 883, at page 53, Okla. Rep., this court said:

"Thus it is clear that, in the absence of authority vested in it by law, the judiciary cannot interfere with the policy, judgment, or discretion of the chief executive in matters pertaining to the functioning of the executive department.

"It is unnecessary to decide this case upon the doctrine that the power to remove is an incident to the power to appoint, although the federal courts have uniformly adhered to such doctrine, and in our opinion, the far better reasoned cases from the state courts have concurred in the same doctrine; but it is unnecessary to resort to that doctrine in the determination of this case; the statute has determined it. Neither is it necessary to determine the effect of statutory provisions which fix the term of office for a definite period of years, for the very provision of statute authorizing a removal for cause precludes the right to hold for the entire term regardless of cause.

"Neither is it necessary to analyze the decisions involving the right of removal from elective offices. The direct question we have before us is the right of the Governor to remove an appointee from an appointive position in a subordinate department of the Governor's special sphere of responsibilities. The Legislature has created the department in question, created the appointive position in question, given the Governor the appointing power, and authorized the Governor to remove the appointee for cause, and furthermore has authorized the Governor to determine the sufficiency of cause. This takes it away from the courts. For the courts to attempt to interfere would be to attempt to exercise an authority which the law has expressly vested in another department of government."

Thus it can be seen this court approved the federal rule as was announced in the Myers Case, supra.

We are now asked to set aside this construction because in a heated political difference of opinion the Legislature attempted to create an executive department of government, appointed by the Governor, to hold office at will for a term of six years; and sought to remove from the executive department of government the authority to control said department.

Section 6 of article 4 of the Constitution provides that the term of all executive officers created by the Constitution of Oklahoma, including the chief executive, shall be four years; and further provides that the Governor, Secretary of State, State Auditor, and State Treasurer shall not be eligible immediately to succeed themselves.

So it can been seen, under our Constitution, that all constitutional executive officers must submit their claims to the people at least every four years. There is no executive office provided for in the Constitution which exceeds four years. The right of the people to change their executive officers every four years is a constitutional right, and the attempt on the part of the Legislature to create an office for a longer term is a violation of the public policy of this state and contrary to the Constitution of Oklahoma. If the Legislature may create an executive officer to perform the duties of the chief executive of Oklahoma for a period of six years, then it could be created for sixteen years or for life. Under the law as construed and approved by the majority opinion, a Legislature, drunk with power, could create all executive officers of the state of Oklahoma, boards and commissions now appointed by the Governor, and give them life tenure in office, and it would be beyond authority of the people at the regular elections each four years for state executive officers to change or remove those officers. Of course, they could be removed by initiative and referendum petitions or by amendments to the Constitution or by an act of the Legislature, but why should the people be compelled to go to that extent to change an inferior executive officer when the chief executive and other constitutional officers can be changed by the people every four years?

The people in 1930 went to the polls and by a large majority elected the executive officers for this state, including the now chief executive, and by their mandate at the polls they reposed in the different officers elected and the chief executive the duties to see that the laws were faithfully enforced and carried out. The delegation to perform the executive duties delegated to them by the Constitution of Oklahoma and the laws of this state.

To say that the Legislature could create a Board of Affairs, a Highway Commission, and assistant Labor Commissioner, assistant State Treasurer or a commission to perform the duties of the State Treasurer, or commission to perform the duties of the Attorney General of this state, and make their terms of office for life, would be to say that the Constitution in creating executive officers must be ignored, and the people's

right to change their executive officers stricken down and taken from them.

The office of Attorney General of the state of Oklahoma is a constitutional executive office created and made such by the Constitution of Oklahoma, and as such to perform the duties of the Attorney General. Suppose the Legislature should create eight assistants or eight deputies or eight officers whose duty it would be to perform the duties now performed by the Attorney General's assistants and make their term of office for sixteen years, and provide for their appointment by the Governor, and provide that they could only be removed— not by the Attorney General—but by the courts for cause. Could the Attorney General perform the many duties of his office with such a force—each one exercising the authority of an Attorney General, each one entertaining a different view as to the policy of his office? It does not take a wise man to see that the result would be chaos, and the efficiency of the office would be destroyed.

If the majority opinion is correct, this can be done by the Legislature. In my judgment it would be the quickest way to destroy efficiency and competent government.

It is true that section 1 of article 16 of the Constitution of Oklahoma provides:

"The Legislature is directed to establish a Department of Highways, and shall have the power to create improvement districts and provide for building and maintaining public roads, and may provide for the utilization of convict and punitive labor thereon."

That is all that is said in the Constitution in regard to the Department of Highways. No doubt the writers of the Constitution realized and knew that the Department of Highways would be in the executive department of government. It did not authorize the Legislature to create a separate and distinct department contrary to section 1 of article 4 of the Constitution, which provides that the legislative, executive, and judicial departments of government shall be separate and distinct. It did not mean the Legislature could add to the three departments of government a Highway Department and make four departments of government.

The act under consideration in providing the term of office of an inferior executive officer and for him to perform the duties of a chief executive is contrary to the Constitution and public policy expressed in our Constitution that all state executive officers' terms shall be four years. It is contrary to section 1 of article 4, which provides that the powers of government shall be divided into three separate and distinct branches, and as was said in the case of Bynum v. Strain, supra:

"The judiciary cannot interfere with the policy, judgment, or discretion of the chief executive in matters pertaining to the functioning of the executive department."

Since, under our Constitution, the Highway Department must deal with the federal government in matters of constructing highways, the Legislature is without authority to take from the Governor the constitutional mandate that he shall conduct such dealings in person, and vest such power in an appointive executive officer independent of the executive branch of government.

Made responsible under the Constitution for the effective enforcement of the law, the Governor of Oklahoma should not be hampered in the performance of that duty by fastening upon him, as subordinate executive officers, men who by their inefficient service under him, by their lack of loyalty to the service, or by their different views of policy, might make his taking care that the laws be faithfully executed most difficult and in most instances impossible.

To permit the Legislature to encroach upon the executive department of government, and through powerful influences of political ambition to reserve offices at the hands of the Legislature contrary to the will of the people of the state of Oklahoma, and provide that such officers shall perform a part of the duties delegated to the Governor of Oklahoma by the Constitution of Oklahoma, is to destroy the principles of our form of government, and contrary to the genius of a free people.

As far back as the trained eye of the student may examine the Constitution and the principles on which our government is founded, the three departments must be separate, and where they are merged a tyranny will result.

The very principle of our government, section 1 of article 2 of the Constitution of Oklahoma provides:

"All political power is inherent in the people; and government is instituted for their protection, security, and benefit, and to promote their general welfare. * * *"

To create offices beyond the reach of the people at their regular election held for

state executive officers is to deny them the rights guaranteed under section 1 of article 2 of the Constitution.

I know of no authority or sound reasoning leading up to such conclusions.

The reasoning throughout the Myers Case was that the Constitution of the United States vested the supreme executive power in the President of the United States, and being vested in the President, that he could not perform those duties if they were to be performed by subordinates over which he had no control.

Section 2 of article 6 of the Constitution of Oklahoma vests the supreme executive power in the chief magistrate, who shall be styled "The Governor of the State of Oklahoma."

Section 8 of article 6 of the Constitution of Oklahoma provides in part:

"(The Governor) shall cause the laws of the state to be faithfully executed. * * *"

Section 3 of article 2 of the Constitution of the United States provides in part (speaking of the President):

"He shall take care that the laws be faithfully executed. * * *"

So it can be seen there is no fundamental difference between the powers of the Governor of the state of Oklahoma, as chief executive, and the powers of the President of the United States as chief executive. It is enjoined upon both of them—one that

"(The Governor) shall cause the laws of the state to be faithfully executed"

—and the other,

"(The President) shall take care that the laws be faithfully executed."

No difference in meaning. No fundamental difference in effect.

Yet the majority opinion says there is a fundamental difference. With this I cannot agree, and there is no fundamental difference in division of authority, legislative, executive, and judicial.

It is contended that because our Constitution provided that the Legislature should create a Highway Department, that made a fundamental difference between the Myers Case, supra, and the Wentz Case.

Section 8 of article 1 of the Constitution of the United States provides in part:

"The Congress shall have power *** to establish post offices and post roads.***"

So it can be seen there is no fundamental difference between the Myers Case and the Wentz Case.

The Constitution authorized the post office to be created that Mr. Myers was removed from by President Wilson and said removal was upheld by the Supreme Court of the United States.

The Constitution of Oklahoma authorized the Legislature to create a Highway Department; so there is no fundamental difference there.

Congress of the United States attempted to put the power of removal of Myers in the President and the Senate. The Legislature of Oklahoma attempted to put the removal of Wentz in the courts; therefore in no particular, either constitutional or legislative, is there a fundamental difference.

Therefore, I believe this court should follow the rule in Bynum v. Strain, supra, which followed the federal rule as announced in the Myers Case, supra. This rule leads to wholesome, effective, and constitutional government. This would leave the government conducted for the people by their chosen representatives selected by them at the polls rather than by those who are selected by appointment.

For reasons stated, I cannot agree with the majority opinion.

Note.—See under (3) 22 R. C. L. 562; R. C. L. Pocket Part, title "Public Officers," § 266. (5) 6 R. C. L. 151; R. C. L. Perm. Supp. p. 1631.